# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

|                          |   |                              |
|--------------------------|---|------------------------------|
| TD BANK, N.A.,           | : |                              |
|                          | : |                              |
| Plaintiff,               | : |                              |
|                          | : |                              |
| v.                       | : |                              |
|                          | : | Civil No. 12-7188 (RBK/JS)   |
| VERNON W. HILL, II,      | : |                              |
|                          | : | **OPINION**                  |
| Defendant,               | : |                              |

**KUGLER**, United States District Judge:

This matter arises out of Plaintiff TD Bank, N.A.'s claims against Defendant Vernon W. Hill under the Copyright Act of 1976, 17 U.S.C. §§ 101, et seq., for willfully copying a copyrighted book manuscript over which TD Bank allegedly has sole ownership. (Doc. No. 1 ("Compl.").) Mr. Hill disputes TD Bank's claims, however, and asserts seven counterclaims against TD Bank: (1) declaratory judgment of copyright co-ownership; (2) declaratory judgment of non-infringement; (3) tortious interference with contractual relations and/or prospective economic damage; (4) improper takedown notice under the Digital Millennium Copyright Act, 17 U.S.C. § 512(f); (5) waste; (6) misappropriation of ideas; and (7) unfair competition. (Doc. No. 18 ("Countercl.").)

Currently before the Court is TD Bank's Motion to Dismiss Mr. Hill's Counterclaims, except for Counterclaim Two (declaratory judgment of non-infringement), for failure to state a

claim upon which relief can be granted pursuant to Federal Rules of Civil Procedure 12(b)(6). (Doc. No. 33.)

For the following reasons, TD Bank's motion is **GRANTED IN PART** and **DENIED IN PART**.

I. **FACTUAL AND PROCEDURAL BACKGROUND**

Mr. Hill was the founder and former Chairman, President, and Chief Executive Officer of Commerce Bancorp, LLC, ("Commerce Bancorp"), an affiliate of Commerce Bank, N.A., ("Commerce Bank"). (Countercl. ¶¶ 2, 27.) TD Bank is the successor by merger to Commerce Bank. (Id. ¶ 3.)

In 2006, Mr. Hill started working on a book manuscript that was entitled The Power of WOW!, and was assisted by the author Robert Andelman. (Id. ¶ 7.) The manuscript described Mr. Hill's "unique approach" to banking and how that approach was implemented at Commerce Bancorp. (Id. ¶ 11.) Illustratively, the manuscript described Mr. Hill's focus on the total experience of banking, with an emphasis on customer service, rather than a focus on rates. (Id. ¶ 12.) As Mr. Hill and Mr. Andelman continued their work on the manuscript, "the scope of the project and focus of the work underwent a number of changes. By 2007, Mr. Hill and Mr. Andelman shared a manuscript with Commerce Bank entitled Fans, Not Customers: Creating Super-Growth in a No-Growth Industry," (the "Unpublished Manuscript"). (Id. ¶ 10.) Desiring that his work reach a larger audience, Mr. Hill entered into a number of agreements with Commerce Bank and Portfolio Books ("Portfolio") to allow his work to be published. (Id. ¶ 8.) It was always his intent and Commerce Bank's intent, however, that he retain all of his own rights in the Unpublished Manuscript as a co-owner. (Id.)

2

Mr. Andelman's contributions to the Unpublished Manuscript were governed by two contracts.  In a January 4, 2006, Agreement (the "Andelman Agreement"), Commerce Bank engaged Mr. Andelman to work on the Unpublished Manuscript under Mr. Hill's direction and control, described his work as "work made for hire," and provided that Mr. Hill's decision as to any "creative element . . . shall be final."  (Id. ¶ 15.)  Mr. Andelman also signed a release of claims dated October 16, 2007, (the "Andelman Release").  (Id. ¶ 16.)  The Andelman Release acknowledged that although the Unpublished Manuscript was accepted for publication by Portfolio, Mr. Andelman and Commerce Bank agreed that it would not be published.  (Id.)  The Andelman Release further released all claims against Commerce Bank for compensation stemming from the creation of the Unpublished Manuscript.  (Id.)

In contrast, Mr. Hill did not sign any contracts with Commerce Bank similar to the Andelman Agreement or Andelman Release.  (Id. ¶ 17.)  He also did not execute any document ceding his rights in the Unpublished Manuscript to Commerce Bank.  (Id.)  Mr. Hill alleges that he was acting in his personal capacity when he wrote the Unpublished Manuscript, and that he always believed that he retained his own rights in the copyright to the Unpublished Manuscript as a co-author.  (Id. ¶¶ 18-19.)  Indeed, during the creation of the Unpublished Manuscript, Mr. Hill directly supervised Mr. Andelman's work, contributed his own components without input from anyone at Commerce Bank, did not receive any approval or edits from the Commerce Board, and completed the balance of work on the Unpublished Manuscript outside of Commerce Bank facilities and outside of his customary working hours.  (Id. ¶ 9.)  At no point, however, did Commerce Bank consent to any plans to publish the Unpublished Manuscript.  (Id. ¶ 13.)

Mr. Hill was employed by Commerce Bancorp until July 31, 2007.  (Id. ¶ 2.)  After Hill's separation from Commerce Bancorp, he launched Metro Bank in the United Kingdom.  (Id. ¶

20.) The success of Metro Bank garnered extensive press coverage and led Mr. Hill to again team up with Mr. Andelman to write a new book, FANS! Not Customers: How to Create Growth Companies in a No-Growth World, (the "Hill Book"). (Id. ¶ 21.) The Hill Book focused on Metro Bank and how Mr. Hill's business philosophy was as successful in the United Kingdom as it had been in the United States. (Id.)

In order to "produce, publish, market, and sell the Hill Book," Mr. Hill entered into a contract with Profile, who entered into a contract with Consortium Book Sales and Distribution ("Consortium") on Mr. Hill's behalf, to provide copies of the Hill Book to retailers. (Id. ¶ 40.) These companies then entered into arrangements with various booksellers so that the Hill Book could be sold to the public. (Id.) As of November 2012, the Hill Book was being sold in brick-and-mortar stores and online. (Id. ¶ 41.) The launch of the Hill Book was timed to capitalize on "anticipated pre-holiday spikes in retail sales" and an increase in interest stemming from Mr. Hill's efforts to publicize the book. (Id. ¶ 43.) As of December 3, 2012, it appeared that there was demand for the Hill Book; "it was ranked #4 on Amazon's Best Sellers list in books on Retailing, #6 in Customer Service, and #9 in Banks & Banking." (Id. ¶ 45.) "However, in late November, both Amazon.com and Barnes & Noble abruptly discontinued online sales of the Hill Book." (Id. ¶ 46.)

On November 19, 2012, TD Bank filed suit against Mr. Hill for copyright infringement. (Compl.) On or around November 21, 2012, Mr. Hill received word from Profile that it had been contacted by TD Bank and "informed that the Hill Book infringed the Unpublished Manuscript." (Id. ¶ 47.) In its letter to Profile, TD Bank asked that Profile "'take all necessary actions to prevent and enjoin all further marketing, reproduction, distribution, publication and sales of' the Hill Book." (Id. ¶ 47.) Around that same time, TD Bank also sent takedown notices to online

service providers, in which it represented that the Hill Book infringed the Unpublished Manuscript. (Id. ¶ 76.) As a result of TD Bank's actions, Mr. Hill alleges that he was "deprived of the opportunity to sell the Hill Book at the key moment when publicity and demand . . . were at their height." (Id. ¶ 49.)

On January 22, 2013, Mr. Hill filed his Answer and Counterclaims in response to TD Bank's Complaint. (Doc. No. 18.) TD Bank moved to dismiss Mr. Hill's Counterclaims on February 12, 2013. (Doc. No. 22.) TD Bank's motion was fully briefed by the parties, but dismissed without prejudice in light of settlement negotiations. (See Doc. Nos. 22, 25, 26, 27.) Since settlement negotiations were not successful, TD Bank re-filed its Motion to Dismiss on October 30, 2013. (Doc. No. 33.) As this Motion has been fully briefed by the parties, (Doc. Nos. 35, 37), the Court will now turn to the parties' arguments.

## II. DISCUSSION & ANALYSIS

### A. Legal Standard on a Motion to Dismiss

When deciding a motion to dismiss a counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6), the court limits its review to the face of the counterclaim. Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 835 (3d Cir. 2011). The Court must accept as true all well-pleaded factual allegations and must construe them in the light most favorable to the non-moving party. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). In other words, a [counterclaim] is sufficient if it contains enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "The inquiry is not whether [a counterclaimant] will ultimately prevail in a trial on the merits, but whether [he or she] should be afforded an opportunity to offer evidence in support of [his or her] claims. In re Rockefeller Ctr.

5

Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002). However, legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

"To decide a motion to dismiss, courts generally consider only the allegations contained in the [counterclaim], exhibits attached to the [counterclaim] and matters of public record." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted). The court may consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the [counterclaims] are based on the [attached] document[s]." Id. "[D]ocuments whose contents are alleged in the [counterclaim] and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002) (citation omitted); see also U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002) ("Although a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the [counterclaim] may be considered without converting the motion to dismiss into one for summary judgment"). Additionally, even if a "[counterclaim] does not explicitly refer to or cite [a document] . . . the critical [issue] is whether the claims in the [counterclaim] are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (citations omitted). The Court may not, however, "rely on other parts of the record in making its decision." See Vartan v. Wells Fargo Bank Nw., N.A., No. 11-1225, 2012 WL 1339904, at *3 (M.D. Pa. Apr. 18, 2012) (citing Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994)).

To determine whether a complaint is plausible on its face, courts conduct a three-part analysis. Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Id. (quoting Iqbal, 556 U.S. at 675). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 131 (quoting Iqbal, 556 U.S. at 680). Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Id. (quoting Iqbal, 556 U.S. at 680). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible. Id.

### B. Counterclaim One – Declaratory Judgment of Co-Authorship under the U.S. Copyright Act, 17 U.S.C. § 101.

In Counterclaim One, Mr. Hill seeks a declaratory judgment, under the Copyright Act, that he is a co-author of the Unpublished Manuscript.

The Copyright Act sets forth a detailed scheme that provides copyright protection for original works of authorship. Works of authorship include, among other things, literary works. 17 U.S.C. § 102. The Copyright Act defines terms such as "copyright owner," "joint work," and "work made for hire." Id. § 101. It also "controls vesting of copyright in authors; sets out the ownership status of authors and co-authors of joint works; and establishes copyright ownership by employers who commission works made for hire." Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. KG., 510 F.3d 77, 86 (1st Cir. 2007) (citing 17 U.S.C. § 201).

Illustratively, where two or more authors prepare a work "with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole," that work will be deemed to be a "joint work" pursuant to 17 U.S.C. § 101. "The touchstone of th[is] statutory definition is the intention at the time the writing is done that the parts be absorbed or combined into an integrated unit." Thomson v. Larson, 147 F.3d 195, 199 (2d Cir. 1998) (citation omitted). Co-authorship entitles the co-authors to "equal undivided interests in the whole work." Id. Indeed, the authors of a joint work are co-owners of copyright in the work, 17 U.S.C. § 201(a), and thus are entitled to distribute the joint work, Bumgarner v. Hart, No. 05-3900, 2007 WL 2470094, at *6 (D.N.J. Aug. 30, 2007). Further, "a joint copyright holder cannot bring an infringement action against the co-author." Id. (citing Weissmann v. Freeman, 868 F.2d 1313, 1318 (2d Cir .1989)).

Comparatively, a "work made for hire" is "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." Id. § 201(b).

Here, TD Bank contends that Mr. Hill has no claim of authorship in the Unpublished Manuscript, and thus no claim for co-ownership in the copyright. In support of these contentions, TD Bank points to a signed Guaranty that identifies Commerce Bank as the author of the Unpublished Manuscript and identifies the Unpublished Manuscript as a "work made for

8

hire."[1] (TD Bank Br. 4-7.) TD Bank further argues that in light of this signed Guaranty, Mr. Hill cannot state a claim for co-ownership because he has failed to allege any signed writings by the parties that would contradict the Guaranty, and thus Commerce Bank's ownership, as is required by the Copyright Act.[2] (Id.)

Although TD Bank relies on the signed Guaranty as proof that Mr. Hill's claim for co-authorship cannot stand, Mr. Hill explicitly alleged that this signed Guaranty did not cover the full scope of his relationship with Commerce Bank, i.e., that he and Commerce Bank mutually and fully intended to serve as co-authors, and that they intended that the Unpublished Manuscript be a joint work under 17 U.S.C. § 101. (Countercl. ¶ 55.) At this stage of the proceedings, Mr. Hill need not offer detailed evidence—documentary or otherwise—disputing the contents of the signed Guaranty. Mr. Hill's allegation that "he and Commerce Bank intended that Hill would retain his individual rights as co-owner," make it more plausible than not that Commerce Bank and Mr. Hill intended at the time the Unpublished Manuscript was created that it would be a joint

---

[1] Although Mr. Hill did not attach the signed Guaranty to his Counterclaim, rather it is attached as Exhibit B to TD Bank's Complaint, this document is properly considered in evaluating TD Bank's motion to dismiss as it is referenced in Mr. Hill's Counterclaim, (see Countercl. ¶ 55), and heavily relied on by both parties in their briefing. See Section A supra.

[2] TD Bank also argues that Mr. Hill's claim as to co-ownership is barred by the applicable statute of limitations set forth in 17 U.S.C § 507(b) because once Mr. Hill signed the Guaranty he "discovered" TD Bank's sole ownership claim, and thus the statute of limitations began to run and expired, at the latest, by 2010. (TD Bank Br. 4-7.) "A coauthorship claim, like any civil claim, accrues when a reasonably diligent plaintiff "knows or has reason to know of the injury upon which the claim is premised." Davis v. Meridian Films, Inc., 14 F. App'x 178, 181 (4th Cir. 2001) (quoting Merchant v. Levy, 92 F.3d 51, 56 (2d Cir.1996)). Here, however, Mr. Hill alleges that it was always his understanding that he retained his individual rights as co-owner of the copyright in the Unpublished Manuscript and that he and Commerce Bank "mutually and fully intended to serve as co-authors, and for the Unpublished Manuscript to be a joint work under 17 U.S.C. § 101." (Countercl. ¶ 55.) Although the signed Guaranty identifies Commerce Bank as an "Author" and the Unpublished Manuscript as a "work made for hire," Mr. Hill's allegations to the contrary are sufficient to make it more plausible than not that when he signed the Guaranty, he did not view it to be an expression of Commerce Bank's sole ownership in the Unpublished Manuscript such that he would be on notice of Commerce Bank's alleged claim, thus triggering the statute of limitations. Cf. Price v. Fox Entm't Grp., Inc., 473 F. Supp. 2d 446, 455 (S.D.N.Y. 2007) ("[a]n express assertion of sole authorship or ownership will start the copyright statute of limitations running").

work under 17 U.S.C. § 101. This alleged intention makes it more plausible than not that Mr. Hill is entitled to relief.

To the extent the signed Guaranty identifies the Unpublished Manuscript as a "work made for hire," which would vest authorship in Commerce Bank as Mr. Hill's employer,[3] Mr. Hill also makes a number of allegations that dispute that characterization. Indeed, he argues that drafting the Unpublished Manuscript did not fall within the scope of his employment, and thus could not be a work made for hire, because: (1) he "was the company's Chief Executive Officer, and authoring a book manuscript was clearly outside the scope of work that he was employed to perform," (2) "he was acting in his personal capacity when he wrote the book," (3) "Commerce Bank played no role in the preparation or drafting of the [Unpublished Manuscript]," (4) "Mr. Hill supervised Mr. Andelman's work and contributed his own components without any supervision, commenting, or edits from anyone at Commerce Bank," and (5) "The Commerce Board did not approve or edit the project, and the balance of the work was done outside Commerce facilities and not during Mr. Hill's customary working hours." (Id. ¶¶ 9, 18).

Again, on a motion to dismiss, as long as the Counterclaimant has set forth sufficient allegations that plausibly give rise to an entitlement for relief, it is not appropriate for the Court to make any factual determinations as to the validity and enforceability of the signed Guaranty. Further, it would be inappropriate to engage in the fact-intensive inquiry required to determine whether the Unpublished Manuscript was created within the scope of Mr. Hill's employment and thus qualifies as a work made for hire. See, e.g., City of Newark v. Beasley, 883 F. Supp. 3, 7-8 (D.N.J. 1995) (whether work was created within scope of employment was subject to evaluation

---

[3] Although Mr. Hill alleges in his Counterclaim that he was employed by Commerce Bancorp, his allegations concerning the scope of his employment make reference to Commerce Bank. The Court acknowledges the distinction, but observes that it creates no difference as to the merits of the motion to dismiss.

10

under a three part test, which considered whether the work (1) "is of the kind of work [employee] is employed to perform; (2) [i]t occurs substantially within authorized work hours; (3) [i]t is actuated, at least in part, by a purpose to serve the employer") (citing Restatement (Second) of Agency § 228 (1958)).

Of course, although Mr. Hill has set forth sufficient allegations to survive TD Bank's motion to dismiss Counterclaim One, it does not necessarily follow that this counterclaim will ultimately prevail. At this stage of the proceedings, however, Mr. Hill's allegations pass muster; therefore, TD Bank's motion to dismiss Counterclaim One will be denied.

### C. Counterclaim Three – Tortious Interference with Contractual Relations and/or Prospective Economic Advantage.

Mr. Hill's third counterclaim arises out of his alleged expectation of economic benefit stemming from his contract with Profile to produce, publish, market, and sell the Hill Book, as well as Profile's contracts with distributors and retailers to sell the Hill Book. (Countercl. ¶¶ 65-66.) Mr. Hill alleges that by sending notices to Profile and certain retailers stating that the Hill Book infringed on TD Bank's copyright in the Unpublished Manuscript, and by inducing Consortium to ask retailers to cease sales of the Hill Book, TD Bank engaged in tortious interference. (Id. ¶ 67.) TD Bank argues that Counterclaim Three fails because, among other things, TD Bank's actions are privileged under New Jersey law. Mr. Hill responds that he has sufficiently pled a claim for tortious interference and the litigation privilege does not apply. TD Bank has the better of the argument.

The litigation privilege under New Jersey law applies to any communications (1) "made in judicial or quasi-judicial proceedings"; (2) by litigants or other authorized participants"; (3) "to achieve the objects of the litigation"; and (4) "that have some connection or logical relation

to the action." Hawkins v. Harris, 661 A.2d 284, 289 (N.J. 1995). "Whether a defendant is entitled to the privilege is a question of law." Id.

Here, Mr. Hill attacks TD Bank's letter to Profile and notices to online service providers in which TD Bank asserted that the Hill Book infringed upon the Unpublished Manuscript; however, these communications are plainly protected by the litigation privilege.

First, TD Bank's communications were made in connection with judicial proceeding, i.e., TD Bank's copyright infringement suit against Mr. Hill. TD Bank filed suit against Mr. Hill for copyright infringement on November 19, 2012, and then alerted Profile and online retailers to this alleged infringement one day later. (See Countercl. Ex. 1 (Letter to Profile, dated Nov. 20, 2012, informing Profile that the Hill Book infringed the Unpublished Manuscript); Countercl. ¶ 76 (alleging that "[o]n information and belief, on or around November 20, 2012, TD Bank sent notices under 17 U.S.C. § 512(c)(3) to online service providers (including, but not limited to, Amazon.com and Barnes & Noble), in which it represented that the Hill Book infringed the Unpublished Manuscript).) Second, these communications were made by TD Bank, a litigant. Third, these communications were undertaken to achieve the objective of TD Bank's suit against Mr. Hill, i.e., to prevent and enjoin Profile and online retailers from "all further marketing, reproduction, distribution, publication and sales of the [Hill Book]" in light of its claims of copyright infringement. (Countercl. Ex. 1 p. 2.) And Fourth, TD Bank's communications were directly related to its action against Mr. Hill in that they informed Profile and the online retailers about TD Bank's allegations of infringement and, in Profile's case, stated that a civil action had already been filed based on those same allegations.

Although Mr. Hill questions the legitimacy of TD Bank's communications and argues that it had no "legitimate basis" for its assertions of copyright infringement, the New Jersey

12

litigation privilege is an absolute privilege, "it protects 'the bad as well as the good, and immunizes those whose statements are protected from an examination of their motives, morals, and intent." Waterloov Gutter Protection Systems Co., Inc. v. Absolute Gutter Protection, L.L.C., 64 F. Supp. 2d 398, 412-13 (D.N.J. 1999) (internal citations omitted). Thus, regardless of whether TD Bank's motives were pure, its conduct at issue is immune from Mr. Hill's claims.

Because all four prongs of the Hawkins test are satisfied, TD Bank's communications to Profile and online retailers are privileged and cannot form the basis of a claim for tortious inference. Accordingly, TD Bank's motion to dismiss Counterclaim Three is granted.[4]

### D. Counterclaim Four – Improper Takedown Notice Under the Digital Millennium Copyright Act, 17 U.S.C. § 512(f).

The Digital Millennium Copyright Act, ("DMCA"), "contains a number of measures designed to enlist the cooperation of Internet and other online service providers to combat

---

[4] Mr. Hill's counterclaims for waste, misappropriation of ideas, and unfair competition—Counterclaims Five, Six, and Seven—are also barred by New Jersey's litigation privilege.

In Mr. Hill's waste claim, he seeks to hold TD Bank liable for attaching the Unpublished Manuscript to its Complaint, which it filed on November 19, 2012. He alleges that by including the Unpublished Manuscript as an exhibit, TD Bank "is destroying and attempting to destroy the value of Mr. Hill's copyright in the Unpublished Manuscript." (Countercl. ¶ 84.) However, TD Bank's Complaint, and the exhibit at issue, are unquestionably "communications" made by a litigant within a judicial proceeding covered by the litigation privilege. See, e.g., Loigman v. Twp. Comm. of Twp. of Middletown, 889 A.2d 426, 437 (N.J. 2006) (holding that motion was a "'communication' within a proceeding covered by the [litigation] privilege."). Certainly, in bringing a cause of action for copyright infringement, attaching the allegedly copyrighted work and allegedly infringing work as exhibits can be said to be in furtherance of achieving the objects of the litigation. Without the material at issue—the Hill Book and the Unpublished Manuscript—it would be difficult to determine whether infringement actually occurred. (See Compl. Exs. B-C).

As for Mr. Hill's claim that TD Bank's conduct constitutes misappropriation of ideas, a cause of action based on this theory requires that the idea was (1) novel; (2) made in confidence to the defendant; and (3) adopted and used by the defendant in connection with his own activities. Baer v. Chase, 392 F.3d 609, 627 (3d Cir. 2004). Here, although Mr. Hill alleges that TD Bank "*adopted and made use* of its claim of copyright ownership in the Unpublished Manuscript to attempt to prevent Mr. Hill's publishing his ideas in the Hill Book," he again seeks to challenge conduct solely related to the filing of TD Bank's lawsuit and claim for copyright infringement and sets forth no allegations as to how filing this suit adopts and makes use of his novel ideas. (Countercl. ¶ 90 (emphasis added).) Because TD Bank's communication to this Court—via its Complaint—setting forth its claim for copyright infringement is a privileged communication, it cannot form the basis for this claim.

Finally, Mr. Hill's unfair competition claim suffers from similar defects in that it simply argues that TD Bank's suit against Mr. Hill and its "frivolous intellectual property claims" represent an attempt to stifle competition.

ongoing copyright infringement." Rossi v. Motion Picture Ass'n of Am. Inc., 391 F.3d 1000, 1003 (9th Cir. 2004). DMCA sets out the responsibilities of copyright owners, internet users, and service providers (e.g., Amazon.com), in dealing with potential infringement "that take[s] place in the digital networked environment." Id. (quoting H.R. Rep. 105-551, pt. 2, at 49 (1998)). The Act's "takedown" scheme, set forth in 17 U.S.C. § 512(c), provides an avenue by which a copyright owner can police suspected infringement. This section essentially allows the copyright owner to serve a notice of the claimed infringement to the online service provider which requires the provider to remove the allegedly infringing material from the internet. 17 U.S.C. §§ 512(c)(1)(C), (c)(3).

In Counterclaim Four, Mr. Hill alleges that TD Bank sent takedown notices to online service providers pursuant to section 512(c)(3) in which it represented that the Hill Book infringed the Unpublished Manuscript. (Countercl. ¶ 76.) Mr. Hill alleges that by sending these notices, TD Bank violated section 512(f) of DMCA, which provides, in relevant part:

> Any person who knowingly materially misrepresents under this section . . . that material or activity is infringing . . . shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer . . . who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing . . . .

17 U.S.C. § 512(f).

In Rossi, the Ninth Circuit explained the purpose of section 512(f) as well as its limitations. 391 F.3d at 1004-1005. Specifically, the Ninth Circuit clarified that section 512(f) was "an expressly limited cause of action for improper infringement notifications" and that it only imposed liability "if the copyright owner's notification [was] a knowing misrepresentation."

---

(Countercl. ¶¶ 93-94.) Again, as these allegations challenge conduct that is privileged, i.e., TD Bank's communications to this Court in furtherance of their suit for copyright infringement, this claim cannot stand. Accordingly, Counterclaims Five, Six, and Seven will also be dismissed.

Id. at 1004 (emphasis added). Thus, a copyright owner would not be liable if it made an unknowing mistake, even if it acted unreasonably in making that mistake. Id. "Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner." Id. at 1004-1005. See also Tuteur v. Crosley-Corcoran, -- F. Supp. 2d --, 2013 WL 4832601, at *7 (D. Mass. Sept. 10, 2013) ("to give rise to liability under 512(f) . . . a plaintiff must show that the defendant had some actual knowledge that its Takedown Notice contained a material misrepresentation." (citation and internal quotation marks omitted)).

Here, TD Bank argues that Mr. Hill has failed to state a claim under section 512(f) because although he alleges that "[a]t the time it sent these notices, TD Bank knew that the Hill Book did not infringe the Unpublished Manuscript because [ ] Mr. Hill is a co-author," he failed to allege any facts showing that TD Bank possessed a subjective belief that Mr. Hill was a co-author, and thus intentionally lied in its notices. (TD Bank Reply Br. 9.) TD Bank then offers what it believes would be a sufficient allegation of wrongdoing: "To state a Section 512(f) claim, Hill must allege that[] 'TD Bank knew that the Hill Book did not infringe the Unpublished Manuscript because TD Bank believed at the time that (a) Mr. Hill is a co-author . . . .'" (Id. (emphasis in original).) This Court finds, however, that Mr. Hill has sufficiently alleged that TD Bank possessed "some actual knowledge" that its notices contained a material misrepresentation. See Tuteur, 2013 WL 4832601, at *7.

In Counterclaim Four, Mr. Hill plainly alleges that when TD Bank sent its notices to Profile and various online service providers it "knew that the Hill Book did not infringe the Unpublished Manuscript because [ ] Mr. Hill is a co-author." (Countercl. ¶ 77.) As co-authorship entitles "co-authors to equal undivided interests in the whole work—in other words, each joint author has the right to use or to license the work as he or she wishes, subject only to

15

the obligation to account to the other joint owner for any profits that are made," it is reasonable to infer that if TD Bank "knew" that Mr. Hill was a co-author when it sent its notices it also knew that, as a co-author, he was entitled to use the Unpublished Manuscript as he saw fit. Thomson v. Larson, 147 F.3d 195, 199 (2d Cir. 1998) (citing 17 U.S.C. § 201(a)); see also Cmty. for Creative Non–Violence v. Reid, 846 F.2d 1485, 1498 (D.C. Cir. 1988) ("Joint authors co-owning copyright in a work are deemed to be tenants in common, with each having an independent right to use or license the copyright, subject only to a duty to account to the other co-owner for any profits earned thereby."). Because the Court must draw all reasonable inferences in Mr. Hill's favor on a motion to dismiss, Phillips, 515 F.3d at 231, this allegation is sufficient to state a claim under section 512(f).

Accordingly, TD Bank's motion to dismiss Counterclaim Four is denied.

### E. Leave to Amend

"When a plaintiff does not seek leave to amend a deficient [counterclaim] after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).

Here, to permit Mr. Hill to amend Counterclaims Three, Five, Six, and Seven would be futile because the conduct complained of is subject to New Jersey's litigation privilege, and no further amendment could circumvent the application of this privilege. Thus, Counterclaims Three, Five, Six, and Seven will be dismissed with prejudice. See Hartman v. Twp. of

Readington, No. 02-2017, 2006 WL 3485995, at *3 (D.N.J. Nov. 30, 2006) ("Dismissal of a count in a complaint with prejudice is appropriate if amendment would be inequitable or futile").

## III. CONCLUSION

For the reasons stated above, TD Bank's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. An appropriate order will issue today.


Dated: 2/3/2014                                     /s/ Robert B. Kugler
                                                    ROBERT B. KUGLER
                                                    United States District Judge