NOT FOR PUBLICATION                              (Doc. Nos. 65, 66, 73, 82)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

—————————————————————————— :
TD BANK, N.A.,                              :
                                            :
                    Plaintiff,              :    Civil No. 12-7188 (RBK/JS)
                                            :
          v.                                :    **OPINION**
                                            :
VERNON W. HILL, II,                         :
                                            :
                    Defendant.              :
—————————————————————————— :

**KUGLER**, United States District Judge:

      This matter arises from the alleged copyright infringement by Defendant Vernon W. Hill, II ("Defendant" or "Mr. Hill") as to a manuscript owned by Plaintiff TD Bank, N.A. ("TD Bank" or "Plaintiff"). Presently before the Court is Plaintiff's Motion for Summary Judgment (Doc. No. 65) and Defendant's Cross-Motion for Partial Summary Judgment (Doc. No. 73), pursuant to Fed. R. Civ. P. 56. Also before the Court is Plaintiff's Motion to Seal certain documents that it relies upon in its Motion for Summary Judgment, as well as portions of the brief and statement of material facts filed in support of that Motion that discuss the documents at issue (Doc. No. 66), and Defendant's Motion to Seal certain documents that he relies upon in his Cross-Motion for Partial Summary Judgment (Doc. No. 82), pursuant to L. Civ. R. 5.3. For the reasons expressed herein, Plaintiff's Motion for Summary Judgment is **GRANTED**. Defendant's Cross-Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. Both parties' Motions to Seal are **DENIED**.

## I.      BACKGROUND AND PROCEDURAL HISTORY[1]

This is a copyright infringement case in which Defendant admits to using verbatim language from Plaintiff's work in a book that Defendant authored and published.  The dispute centers on whether Defendant owned the rights to those words along with Plaintiff, and if not, whether a valid defense exists under copyright law for Defendant's undeniable copying of the material.  The generally agreed-upon facts are set out below.

Mr. Hill was a founder and former Chairman, President, and Chief Executive Officer of Commerce Bancorp, LLC, an affiliate of Commerce Bank (collectively "Commerce Bank"), to which Plaintiff TD Bank is the successor by merger.  (Pl.'s Statement of Undisputed Material Facts, Doc. No. 65 ("Pl.'s SUMF") ¶¶ 1-2.)  From 2006-2007, during his time as CEO of Commerce Bank, Mr. Hill worked on a manuscript entitled "Fans, Not Customers: Creating Super Growth in a No-Growth Industry," also known as "The Power of Wow" (the "2007 Manuscript").  (Id. at ¶¶ 3, 18.)  Commerce Bank also engaged Robert Andelman, a professional business book writer, to write the 2007 Manuscript.[2]  (Id. at ¶ 9.)

Mr. Hill separated from Commerce Bank in 2007, at which time the 2007 Manuscript remained unpublished.  (Id. at ¶ 40.)  After leaving Commerce Bank, Mr. Hill founded Metro Bank in the United Kingdom.  (Defendant's Statement of Undisputed Material Facts, Doc. No. 75 ("Def.'s SUMF") ¶ 86.)  Mr. Hill thereafter engaged Mr. Andelman to serve as co-author,

---

[1] When considering a motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the non-moving party.  See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993).  Since the Court is ruling on cross-motions for summary judgment, the facts in this Opinion will be viewed in the light most favorable to the party against whom the motion under consideration is being made.  See Clevenger v. First Option Health Plan of New Jersey, 208 F. Supp. 2d 463, 469 (D.N.J. 2002) (the court must "view the evidence on each motion in the light most favorable to the party opposing the motion").

[2] Mr. Andelman's contributions to the 2007 Manuscript constituted a work made for hire owned by Commerce Bank, pursuant to an agreement executed on January 4, 2006.  (Pl.'s SUMF ¶¶ 9-10.)  Mr. Andelman released all of his rights in the 2007 Manuscript to Commerce Bank pursuant to a release agreement between Mr. Andelman and Commerce Bank dated October 16, 2007.  (Id. ¶ 11.)

alongside Mr. Hill, of a book entitled "Fans! Not Customers: How to Create Growth Companies in a No Growth World" (the "2012 Book").  (<u>Id.</u> at ¶ 92.)  In the fall of 2012, the 2012 Book was published by Profile Books Ltd., listing as co-authors Mr. Hill and Mr. Andelman.  (Pl.'s SUMF ¶¶ 48-49.)  The 2012 Book was available for sale on Amazon.com, Barnesandnoble.com, as well as in brick-and-mortar stores.  (<u>Id.</u> at ¶ 50.)

### A.  Facts Relating to Copyright Ownership

On September 19, 2006, Commerce Bank entered into a contract with Portfolio, a division of Penguin Group (USA) Inc. (the "Portfolio Contract"), for potential publication of the 2007 Manuscript.  (<u>Id.</u> at ¶ 5.)  The Portfolio Contract states that "The Author is the sole and exclusive owner of all rights granted to the Publisher in this Agreement and has not assigned, pledged, or otherwise encumbered the same."  (<u>Id.</u> at ¶ 6; Pl.'s Ex. 5, Portfolio Contract ¶ 2, TD00515.)  The Portfolio Contract identifies Commerce Bank as the "Author" and Portfolio as the "Publisher."  (Portfolio Contract at TD00514.)  However, also in the Portfolio Contract, Mr. Hill is identified as the "sole author" of the work.  (<u>Id.</u> at ¶ 2, TD00515.)

Mr. Hill signed an undated letter that refers to the Portfolio Contract (the "Guaranty")[3] and states as follows:

> I have an interest in the Author and in having the Work published by the Publisher, and as an inducement to the Publisher to enter into the Agreement, I hereby unconditionally guarantee, promise and agree with the Publisher, its successors and assigns that the Author will, in all respects, faithfully perform and fulfill all obligations of the Agreement on its part to be performed and fulfilled at the time and in the manner therein provided.  I also unconditionally guarantee that the work is a work made for hire within the meaning of the United States Copyright Law and that the Author is the owner of copyright in the Work…

(Pl.'s Ex. 6, the Guaranty.)  The Guaranty explains that in the Portfolio Contract "and herein," "Commerce Bank., N.A. [is] described . . . as the 'Author' and Portfolio . . . [is] described as 'the

---

[3] Mr. Hill admits that he signed the Guaranty at some point in 2006.  (Def.'s SUMF ¶ 58.)

Publisher.'" (Id.)  Mr. Hill contends that he understood the phrase "work made for hire" to refer to the contributions of Mr. Andelman.  (Hill Decl. ¶ 37.)  The parties dispute whether the Guaranty and the Portfolio Contract are an integrated agreement.  (Pl's SUMF ¶ 8; Def.'s Resp. to Pl.'s SUMF ¶ 8.)  Commerce Bank did not sign the Guaranty; only Mr. Hill's signature appears on that document.  Still, Mr. Hill and his counsel both refer to the Guaranty and Portfolio Contract as "integrated" during Mr. Hill's deposition.  (See, e.g., Pl.'s Ex. 4, Deposition of Vernon W. Hill, II ("Hill Dep.") 154:8-15 ("A: I signed this [referring to the Guaranty] with a 2006 Agreement attached.  Q: Did you believe that that was an integrated part of this document?  A: Yes.").)

TD Bank admits that Commerce Bank intended for Mr. Hill to be an author of the 2007 Manuscript.  (Def.'s SUMF ¶ 30.)  The parties dispute whether Mr. Hill's status as an author granted him an ownership interest under copyright law.  There are no written documents identifying Mr. Hill as a co-owner in the copyright of the 2007 Manuscript.  (Pl.'s SUMF ¶ 12.)  However, Mr. Hill points to documents that identify him as co-author of the 2007 Manuscript, such as a draft collaboration agreement between Commerce Bank and Mr. Andelman that refers to Commerce Bank and Mr. Hill collectively as the "Author," and a template release for individuals appearing in the 2007 Manuscript that refers to Mr. Hill as the "Author."  (Def.'s Resp. to Pl.'s SUMF ¶ 12; Def.'s Ex. E, Draft Collaboration Agreement; Def.'s Ex. F, Release Template.)  Minutes from an August 15, 2006 Commerce Bank Board of Directors meeting also refer to the 2007 Manuscript as "authored by the Chairman."  (Def.'s Ex. G, August 2006 Board Meeting Minutes.)

Mr. Hill contends that he informed Commerce Bank board members that he authored the 2007 Manuscript and understood himself to be an owner of the copyright "[o]n multiple

4

occasions."  (Hill Decl. ¶ 30.)  However, when asked whether he had conversations with Commerce Bank about his co-ownership of the 2007 Manuscript, Mr. Hill stated that he "didn't have any conversations.  I knew I was the co-owner and the co-author."  (Hill Dep. 173:16-17.)  It is TD Bank's position that the first time Mr. Hill communicated to it his belief that he co-owned the copyright was when he filed his Answer and Counterclaims in this lawsuit on January 22, 2013.  (Pl.'s SUMF ¶ 15.)  There is no written document transferring ownership interest in the copyright of the 2007 Manuscript from TD Bank to Mr. Hill.  (Id. at ¶ 13.)  TD Bank registered the copyright in the 2007 Manuscript with the United States Copyright Office on November 16, 2012.  (Pl.'s Ex. 11, Copyright Reg. No. TXu 1-830-575.)  Mr. Hill submitted his own adverse registration claim on January 8, 2013.  (Pl.'s Ex. 9, Copyright Reg. No. TXu001842597.)

Commerce Bank contributed personnel, funds, and resources to create the 2007 manuscript, although the extent of those contributions is disputed.  (Pl.'s SUMF ¶¶ 33-34; Def.'s Resp. to Pl.'s SUMF ¶ 33.)  Several Commerce Bank employees admitted that their contributions or other roles in creating the 2007 Manuscript were made within the scope of their employment.  (Pl.'s SUMF ¶ 35.)  The parties also agree that Commerce Bank personnel contributed marketing and promotional ideas for the 2007 Manuscript.  (Id. at ¶ 28.)  However, Mr. Hill contends that any Commerce Bank employee's involvement in the 2007 Manuscript was limited to answering Mr. Andelman's questions and checking facts.  (Def.'s Resp. to Pl.'s Supp. SUMF ¶ 9.)  Mr. Hill claims that the 2007 Manuscript was written on his own initiative.  (Hill Decl. ¶ 12.)

After leaving Commerce Bank, Mr. Hill took actions to publish the 2007 Manuscript.  In doing so, his agent asked him for "a copy of the letter that reverts rights in the manuscript to you," to which Mr. Hill replied that he "need[ed] a draft letter for TD to sign assigning all rights

to me," which Mr. Hill's agent then provided.  (Pl.'s Ex. 53, Emails between Michael Bourret and Mr. Hill dated June 23 and June 24, 2008.)  TD Bank never made the assignment.  (Pl.'s SUMF ¶ 43.)

   **B.  Facts Relating to the Contents of the Works**

   It is undisputed that the 2007 Manuscript was intended to promote and benefit Commerce Bank and create favorable publicity for Commerce Bank.  (Pl.'s SUMF ¶ 24.)  Nonetheless, the parties do not agree as to whether the 2007 Manuscript is in essence about Commerce Bank or about Mr. Hill's life and business experience and ideas.  (Id. at ¶ 26; Def.'s Resp. to Pl.'s SUMF ¶ 26.)  The 2007 Manuscript describes the business model used by Commerce Bank that Mr. Hill had advocated throughout his career.  (Def.'s SUMF ¶ 47.)  Mr. Hill had previously discussed in public speeches and interviews many of the ideas, business concepts, and Commerce Bank anecdotes contained in the 2007 Manuscript.  (Id. at ¶ 50.)  In addition, some of the content contained in the 2007 Manuscript was also provided to Harvard Business School for use in a case study on Commerce Bank.  (Id.)  On the other hand, the cover of the 2007 Manuscript depicts a giant red Commerce Bank mascot, Commerce Bank logos, a Commerce Bank branch, and happy customers.  (Pl.'s SUMF ¶ 27.)  Plans to market the 2007 Manuscript included plans to insert a $25 coupon for new Commerce Bank accounts, which was intended to "sell books and to get people to bank with the bank."  (Pl.'s SUMF ¶ 29; Hill Dep. 123:7-14.)

   The 2012 Book discusses Metro Bank, along with Commerce Bank, focusing on the business philosophies underlying the creation of the two banks.  (See Pl.'s Ex. 54, the 2012 Book.)  The 2012 Book applies these business philosophies to the British banking industry.  (Id.)  The 2012 Book also discusses another of Mr. Hill's business ventures—Petplan USA.  (Id.)  TD Bank contends that 16 percent of the material in the 2012 Book infringes on its copyright in the

2007 Manuscript.[4]  (Pl.'s Resp. to Def.'s SUMF ¶ 99; Certification of Michael Joshi ¶ 8 and Ex. A.)  The content of the alleged infringing text includes business ideas and philosophies, terms that Mr. Hill used at Metro Bank, biographical facts from Mr. Hill's life, facts regarding other successful companies, descriptions of appreciative customers, feedback about the banks, and factual stories involving Commerce Bank.  (Def.'s SUMF ¶¶105-109.)  Mr. Hill admitted that there are a "few ways" to express the ideas in the 2007 Manuscript.  (Pl.'s SUMF ¶ 56.)  The parties agree that Mr. Hill did not attempt to paraphrase the allegedly infringing language, and in fact copied it verbatim.  (Id. at ¶¶ 54, 57.)

### C.  Facts Relating to Plaintiff's Takedown Notices

TD Bank claims that when it learned of the publication of the 2012 Book, it consulted its copyright counsel who reviewed the Guaranty, the Portfolio Contract, the 2012 Book, and the 2007 Manuscript, and advised TD Bank that it was the sole owner of the copyright and that Mr. Hill had no valid defense.  (Id. at ¶¶ 59-60.)  Defendant claims that it is unknown whether Plaintiff's counsel analyzed TD Bank's ownership of the copyright in the 2007 Manuscript. (Def.'s Resp. to Pl.'s SUMF ¶ 60; Pl.'s Ex. 18, Deposition of John Fisher ("Fisher Dep.") 308:1-15.)  TD Bank sent "takedown notices" to retailers informing them that the 2012 Book infringed upon TD Bank's copyright in the 2007 Manuscript and requesting that the 2012 Book be removed from sale, which it was.  (Def.'s SUMF ¶ 97; Pl.'s Resp. to Def.'s SUMF ¶ 97.)  At least two online booksellers resumed selling the 2012 Book in January 2013.  (Pl.'s SUMF ¶ 63; Def.'s Resp. to Pl.'s SUMF ¶ 63.)  As of the close of discovery, Mr. Hill had received royalties

---

[4] TD Bank originally claimed that 22 percent of the material in the 2012 Book infringed on its copyright in the 2007 Manuscript.  (Def.'s SUMF ¶ 99.)  However, TD Bank corrected this number to 16 percent after Mr. Hill pointed out that TD Bank's analysis included third party content that it does not claim is protected.  (Pl.'s Resp. to Def.'s SUMF ¶ 99; Certification of Michael Joshi ¶ 8 and Ex. A.)

from the sale of the 2012 Book of less than $30,000, and had incurred over $100,000 in expenses related to the production and sale of the 2012 Book.  (Def.'s SUMF ¶¶ 110-111.)

### D.  Procedural History

Plaintiff filed its Complaint on November 19, 2012, alleging Copyright Infringement under the U.S. Copyright Act, 17 U.S.C. § 101 et seq. (the "Copyright Act").  (Doc. No. 1.) Defendant asserted seven counterclaims against TD Bank: (1) declaratory judgment of copyright co-ownership; (2) declaratory judgment of non-infringement; (3) tortious interference with contractual relations and/or prospective economic damage; (4) improper takedown notice under 17 U.S.C. § 512(f); (5) waste; (6) misappropriation of ideas; and (7) unfair competition.  (Doc. No. 18.)  This Court granted in part TD Bank's partial Motion to Dismiss the counterclaims, leaving only his claims for declaratory judgment of copyright co-ownership, declaratory judgement of non-infringement, and improper takedown notice.  (Doc. No. 41.)  Plaintiff filed the instant Motions on December 16, 2014, and Defendant filed his Motions on January 30, 2015.

## II.   MOTIONS TO SEAL

### A.  Legal Standard

Local Civil Rule 5.3 governs requests to seal documents filed with the Court.  Under Rule 5.3(c)(2), a party seeking to seal documents must show: (1) the nature of the materials at issue; (2) the legitimate private or public interests which warrant the relief sought; (3) the injury that would result if the relief sought is not granted; and (4) why a less restrictive alternative to relief sought is not available.  In turn, any order or opinion on a motion to seal must make findings as to those factors.  L. Civ. R. 5.3(c)(5).

Additionally, "there is a presumptive right of public access to pretrial motions of a nondiscovery nature, whether preliminary or dispositive, and the material filed in connection therewith."  Leucadia v. Applied Extrusion Techs., Inc., 998 F.2d 157, 164 (3d Cir. 1993).  To overcome that presumption, a party must demonstrate that "good cause" exists for the protection of the material at issue.  Securimetrics, Inc. v. Iridian Techs., Inc., No. 03-4394, 2006 WL 827889, at *2 (D.N.J. Mar. 30, 2006).  Good cause exists when a party makes a particularized showing that disclosure will cause a "clearly defined and serious injury to the party seeking closure."  Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotations and citations omitted); see Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir. 1995).  A party does not establish good cause by merely providing "broad allegations of harm, unsubstantiated by specific examples or articulated reasoning."  Pansy, 23 F. 3d at 786 (quoting Cipollone v. Liggett Grp. Inc., 785 F.2d 1108, 1121 (3d Cir. 1986)).  To prevail, the party must make this good cause showing with respect to each document sought to be sealed.  Id. at 786–87.

### B.  Plaintiff's Motion to Seal

Plaintiff seeks to seal the following documents: (1) a brief in support of a Motion to Enforce Settlement ("Motion to Enforce Settlement") filed by Defendant in a prior lawsuit, Hill v. Diflorio, Civ. No. 09-3685; and (2) the 2012 Book.  Defendant joins in Plaintiff's Motion as to the Motion to Enforce Settlement.  (Doc. No. 82, p.1).  Because these exhibits were filed in connection with Plaintiff's Motion for Summary Judgment, the presumption in favor of public access applies.  Thus, in addition to the Rule 5.3 factors, Plaintiff must also demonstrate good cause for sealing the documents.

### 1.  Motion to Enforce Settlement

The Motion to Enforce Settlement was originally filed under seal by Defendant in a prior lawsuit and has not been subsequently unsealed by the Court.  (See Civ. No. 09-3685, Doc. No. 354.)[5]  This presents a unique situation to the Court, where in essence the parties are asking the Court to vindicate its prior decision to keep a document under seal.  Although Plaintiff mentions in its brief all of the Rule 5.3 factors, the analysis is cursory.  No matter the factor being addressed, Plaintiff continuously rests on the argument that, because the original Motion to Enforce Settlement was filed under seal, this document should be sealed in the current litigation.

The Motion to Enforce Settlement contains information relating to the unconsummated settlement negotiations that took place in a prior litigation, involving the parties in the current matter.  Generally, settlement documents are subject to the right of access doctrine "(1) when a settlement is filed with a district court; and (2) when the parties seek interpretative assistance from the court or otherwise move to enforce a settlement provision."  LEAP Sys., Inc. v. MoneyTrax, Inc., 638 F. 3d 216, 220 (3d Cir. 2011) (internal quotations omitted).  A generalized interest in encouraging settlements does not necessarily outweigh the public's common law right of access.  See Bank of Am. Nat'l Trust and Sav. Ass'n v. Hotel Rittenhouse Assocs., 800 F.2d 339, 346 (3d Cir. 1986).  However, the presumption may be overcome when justice so requires.  LEAP Sys., 638 F.3d at 222-23 (affirming district court's decision to keep portions of a transcript containing the terms of a settlement agreement under seal where the district court specifically found that the party seeking to seal would not have entered into the settlement agreement "but for the Court's assurance of confidentiality").

---

[5] The parties in the prior litigation did not file a formal motion to seal pursuant to Rule 5.3.  Instead, Defendant filed a notice of motion, followed by a letter advising the Court that the brief in support of his motion was a confidential submission to the Court only.  (Doc. Nos. 353, 354.)  This Court never made a formal ruling on a motion to seal the document at issue, but neither did it order that the document be "unsealed."

Though the fact that the document was sealed in the original litigation does give the Court pause, ultimately Plaintiff has not demonstrated, based on the Rule 5.3 factors, that the Motion to Enforce Settlement should be sealed.  Plaintiff does not allege, for example, that the information contained in the document is confidential, or that the public has no interest in the information.  More importantly, Plaintiff has not made a good cause showing to overcome the presumption in favor of public access.  Plaintiff contends that "the allegations of harm are not generalized, but specific," but the single sentence he provides to support this contention states only that "[d]isclosure of the Motion to Enforce Settlement Agreement would undermine actions taken in the prior Hill litigation."  (Pl.'s Br. 5.)  Plaintiff fails to allege what the specific harm is in not sealing documents that were sealed in a prior litigation.  This Court has denied motions to seal for failing to make a particularized showing of specific harm in situations where parties have alleged more particularized harm than what was alleged here.  See, e.g., Shine v. TD Bank Fin. Grp., No. 09-4377, 2011 WL 3328490, at *8-9 (Aug. 2, 2011) (denying motion to seal where party argued that disclosure of the settlement agreement would cause embarrassment because it made concessions during private negotiations that were inconsistent with its publicly espoused opinions, and that the disclosure of statements between parties during their negotiations would hurt the party's ability to negotiate with future litigants).  For these reasons, Plaintiff's Motion to Seal as to the Motion to Enforce Settlement is denied.

## 2.  The 2012 Book

Plaintiff argues that, while the 2012 Book is not confidential, this submission must be sealed because it is a copyrighted work that Plaintiff has not been authorized to reproduce.  As to the public or private interests at stake, it argues that both the public and Defendant have an important interest in preventing the reproduction of copyrighted works without authorization.

Section 106 of the Copyright Act provides that the owner of a copyright has the exclusive rights "(1) to reproduce the copyrighted work in copies or phonorecords," and "(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending."  17 U.S.C. § 106.  "Unless a copy of the work changes hands in one of the designated ways, a 'distribution' under § 106(3) has not taken place. Merely making an unauthorized copy of a copyrighted work available to the public does not violate a copyright holder's exclusive right of distribution."  Atlantic Recording Corp. v. Howell, 554 F. Supp. 2d 976, 983 (D. Ariz. 2008).  Infringing on the distribution right thus requires an actual dissemination of copies.  Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc., 991 F.2d 426, 434 (8th Cir. 1993).  Filing a copy of the 2012 Book in connection with the instant proceedings does not constitute actual dissemination of copies, but merely makes the work available to the public.

Moreover, under the doctrine of fair use, codified in § 107 of the Copyright Act, works are customarily reproduced in judicial proceedings, including copyright infringement actions such as this one.[6]  See Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 367 (9th Cir. 1992); Jartech, Inc. v. Clancy, 666 F.2d 403, 406-07 (9th Cir. 1982).  Courts must consider the "purpose and character of the use" in determining whether there has been fair use.  17 U.S.C. § 107(1). Where the purpose is not commercial, fair use may be found.  See Video Pipeline, Inc. v. Buena Vista Home Entm't., Inc., 275 F. Supp. 2d 543, 561 (D.N.J. 2003) (citing Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 585 (1994)); Hollander v. Steinberg, 419 Fed. App'x 44, 47 (2d Cir. 2011) (relying in part on a congressional note to the statute that indicated that fair use would include "reproduction of a work in legislative or judicial proceedings or reports").  On the other

---

[6] See also infra, Section III(C)(2)(b) for a discussion of the fair use doctrine.

hand, in instances where the use made is for the same purpose that the copyright holder intended his audience to use or enjoy the work, fair use would not be found.  See Jartech, 666 F.2d at 406-07; Images Audio Visual Prods. Inc. v. Perini Bldg. Co., 91 F. Supp. 2d 1075, 1086 (E.D. Mich. 2000) (differentiating between "copyrighted works that happen to capture information that proves relevant to subsequent litigation, and works that are intended to capture such information, specifically for the purpose of litigation").  In addition, where judicial use does not detract from the normal market use of the work, fair use may also be found. § 107(4).  Because the 2012 Book may thus be properly used in the context of this judicial proceeding, the public and private interests at stake do not warrant the relief sought.

Finally, Plaintiff fails to meet the good cause standard to overcome the presumption of public access.  Plaintiff merely argues that "disclosure of the 2012 Book would undermine Hill's rights to the same."  (Pl.'s Br. 5.)  This is a broad allegation of harm that is not substantiated by specific examples of harm or articulated reasoning that would support a motion to seal.  For the foregoing reasons, Plaintiff's Motion to Seal as to the 2012 Book must also be denied.

**C.  Defendant's Motion to Seal**

Defendant seeks to seal Exhibits O, P, Q, and R to his Declaration, which consist of Mr. Hill's partial losses resulting from the 2012 Book, along with other documents containing similar financial information relating to the 2012 Book.  Because these exhibits were filed in connection with Defendant's Cross-Motion for Summary Judgment, the presumption in favor of public access applies.  Thus, in addition to the Rule 5.3 factors, Defendant must also demonstrate good cause for sealing the documents.

Defendant describes the nature of the documents at issue as confidential because they include financial information regarding Mr. Hill's profits and losses.  The exhibits include

13

royalty statements, profit and loss statements prepared by Defendant's accountant, invoices from the 2012 Book's co-author, and invoices for other expenses related to the 2012 Book.  Defendant contends that he has an interest in maintaining the confidentiality of his personal financial information contained in the documents at issue.  This allegation weighs in favor of sealing the documents.

However, Defendant falls short in establishing the specific injury that would result if his motion is not granted.  Defendant argues that disclosure would undermine his privacy interests in his personal and intimate affairs, and that such disclosure would harm his standing in the British banking marketplace because his public profile is "closely entwined with that of Metro Bank, the British banking company Mr. Hill founded and in which he has a significant financial stake." (Def.'s Br. 4.)  He also argues that because the profit and loss statement contains expenditures by an account owned by Metro Bank, disclosure of details surrounding that account could put the bank at a competitive disadvantage.  (Id.)  The Court finds that such statements are not specific enough to support a "good cause" showing as to the harm that would be suffered if the documents are not sealed.  Although protecting a party from a competitive disadvantage may constitute good cause, see Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 529 F. Supp. 866, 890 (E.D. Pa. 1981), the general allegation of a competitive disadvantage, especially to an entity not a party to the lawsuit, will not suffice.  See Warren Distrib. Co. v. InBev USA, LLC, No. 07-1053, 2010 WL 1491564, at *2 (D.N.J. Apr. 13, 2010).  In addition, Defendant has not demonstrated that there are no less restrictive alternatives to sealing the documents.  For example, any personal information relating to third parties can be redacted from these documents.  For these reasons, Defendant's Motion to Seal is denied.

## III.     MOTIONS FOR SUMMARY JUDGMENT

## A.  Legal Standard

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "The substantive law governing the dispute will determine which facts are material, and only disputes over those facts 'that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  Oquendo v. Bettcher Indus., Inc., 939 F. Supp. 357, 361 (D.N.J. 1996) (quoting Anderson, 477 U.S. at 248).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear

the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen opposing

summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify

those facts of record which would contradict the facts identified by the movant.'" Corliss v.

Varner, 247 Fed. App'x 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. and N.J. v.

Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not

to evaluate the evidence and decide the truth of the matter, but to determine whether there is a

genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province

of the fact finder, not the district court. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974

F.2d 1358, 1363 (3d Cir. 1992).

The standard for resolving a motion for summary judgment does not change when the

parties file cross-motions. See Clevenger, 208 F. Supp. 2d at 468. Although a court may

consider cross-motions for summary judgment concurrently, it must resolve the motions

independently. Williams v. Phila. Hous. Auth., 834 F. Supp. 794, 797 (E.D. Pa. 1993). The

Court will view the evidence on each motion in the light most favorable to the party opposing the

motion. Clevenger, 208 F. Supp. 2d. at 469. A claim by each side that it alone is entitled to

summary judgment "does not constitute an agreement that if one is rejected the other is

necessarily justified or that the losing party waives judicial consideration and determination

whether genuine issues of material fact exist." Transportes Ferreos de Venezuela II CA v. NKK

Corp., 239 F.3d 555, 560 (3d Cir. 2001) (citation omitted). If the record reveals no genuine

issues of material fact, then judgment will be entered in favor of the deserving party in light of

the law and undisputed facts. Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998).

**B.  The Parties' Arguments**

Plaintiff argues that the Court should grant summary judgment in its favor on its copyright infringement claim and Defendant's declaratory judgment counterclaim of co-ownership.  TD Bank maintains that it is the exclusive owner of the copyright in the 2007 Manuscript by virtue of the Guaranty signed with the Portfolio Contract or, alternatively, because the 2007 Manuscript is a "work made for hire" under copyright law.  TD Bank also contends that it is undisputed that Defendant copied protected content from the 2007 Manuscript.  Thus, it urges the Court to find that Defendant committed copyright infringement as a matter of law.  TD Bank also asserts that Mr. Hill's claim to ownership is now time-barred.  Finally, Plaintiff argues that Defendant's counterclaim under § 512(f) fails because no evidence suggests that TD Bank intentionally lied in order to have the 2012 Book removed from various online retailers that were selling the work.

Defendant argues that he owns the copyright in the 2007 Manuscript because he was an author, and it was not a work made for hire.  He also argues that summary judgment should be granted in his favor on the copyright infringement claim because even if he does not own the copyright, the 2012 Book does not infringe on the 2007 Manuscript as it is not substantially similar to that work.  Third, Mr. Hill claims that TD Bank misused its copyright to restrict expression, so its copyright claim cannot be enforced.  Finally, Defendant argues that even if TD Bank were to succeed, it is not entitled to any of the relief it seeks because, among other reasons, it has not alleged any harm caused by the publication and sale of the 2012 Book.

### C.  Copyright Infringement

To prove copyright infringement, a plaintiff must show (1) ownership of a valid copyright in the work allegedly infringed; and (2) that the defendant copied protected elements.

Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 294 (3d Cir. 1991).  The Court will address these elements in turn.

### 1.  Ownership

A copyright "vests initially in the author or authors of the work.  The authors of a joint work are coowners of copyright in the work."  17 U.S.C. § 201(a).  The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." § 101.  "As a general rule, the author is the party who actually creates the work."  Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989).  A co-owner to a copyright cannot commit copyright infringement.  Cortner v. Israel, 732 F.2d 267, 271 (2d Cir. 1984) ("It is elementary that the lawful owner of a copyright is incapable of infringing a copyright interest that is owned by him; nor can a joint owner of a copyright sue his co-owner for infringement.").

An author may be divested of his ownership rights if the work is a "work made for hire." A "work made for hire" is "a work prepared by an employee within the scope of his or her employment."  17 U.S.C. § 101.  Under the Copyright Act, where a work is made for hire, "the employer . . . is considered the author for the purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all the rights comprised in the copyright." § 201(b).

The parties agree that Mr. Hill was a literary author of the 2007 Manuscript, but disagree as to whether his status as a co-author of the work makes him an owner according to copyright law under the facts of this case.

### a.  Statute of Limitations for Defendant's Counterclaim of Co-Ownership

The Court first addresses whether Mr. Hill's counterclaim for declaratory judgment of co-ownership is barred by the statute of limitations.

The Copyright Act contains a three-year statute of limitations.  17 U.S.C. § 507(b). Plaintiff argues that Defendant's counterclaim for declaratory judgment as to co-ownership is time-barred because the statute of limitations began to run in November 2006 when Mr. Hill signed the Guaranty.[7]  The Third Circuit has stated that a party has inquiry notice of his authorship claim, and thus the statute of limitations begins to run, "1) when a cause of action first arose and 2) when [a party] should have known that a cause of action had arisen."  Brownstein v. Lindsay, 742 F.3d 55, 69-70 (3d Cir. 2014).  A cause of action first arises upon "express repudiation" of co-ownership.  Id. at 70.  Whether a party should have known that a cause of action had arisen is governed by the discovery rule.  Id.  Since no facts suggest that Mr. Hill should have "discovered . . . that his rights had been violated" except by virtue of signing the Guaranty if the Guaranty in fact expressly repudiated his co-ownership, the central inquiry here is whether the Guaranty did just that.  Id.

Express repudiation requires that the party disavowing co-ownership "do something that communicated not merely that [it] is the author, but that [it] is the sole author or that [the other party] is not a co-author."  Id. at 71.  The court must ask whether any statements in the Guaranty were "hostile or adverse" to Mr. Hill's ownership rights, because "if an action is not hostile to an author's rights, it may not be plain that his authorship rights have been repudiated.  See id. at 72.

---

[7] Mr. Hill argues that the statute of limitations does not bar a defense to a copyright infringement claim, citing Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 163-64 (2d Cir. 2003).  However, Hogarth is distinguishable because, unlike here, in that case the defendants had not asserted a counterclaim and thus there was no "claim" that the statute of limitations could bar.  Id. at 163 ("A defendant who is not seeking any affirmative relief and who asserts a defense only to defeat a plaintiff's claim is not barred by a statute of limitations.").

Here, the Court cannot determine as a matter of law that the language of the Guaranty and the Portfolio Contract constitute an express repudiation of co-ownership by TD Bank such that the statute of limitations would now bar Mr. Hill's counterclaim of co-ownership.  In the Guaranty, Mr. Hill stated that he "guarantee[s] that the Work is a work made for hire within the meaning of the United States Copyright Law and that the Author is the owner of copyright in the Work."  The Guaranty does not refer to TD Bank as the "sole" owner or author, or state that Mr. Hill is not a co-owner; rather it merely identifies Commerce Bank as "the owner."  The Third Circuit explicitly stated that this is not enough for an express repudiation.  Brownstein, 742 F.3d at 71.  The Brownstein court relied on Zuill v. Shanahan, where the express repudiation occurred only after one party told the other that he was the "sole owner" repeatedly.  80 F.3d 1366, 1368 (9th Cir. 1996); see also Price v. Fox Entm't Grp., Inc., 473 F. Supp. 2d 446, 457-58 (S.D.N.Y. 2007) (finding that a claim to co-authorship was time-barred where the other party had asserted sole authorship several times).  While the Guaranty refers to the Portfolio Contract, which defines Commerce Bank as the Author, the Portfolio Contract also refers to Mr. Hill as the "sole author of the Work," and is thus ambiguous for the purpose of determining express repudiation.

Finally, the statement in the Guaranty that the 2007 Manuscript is a "work made for hire" does not constitute express repudiation.  Although the Brownstein court opined that, in that particular case, express repudiation could occur if the party seeking to avoid the statute of limitations had "overheard a conversation where [the co-author] said that she commissioned [the other co-author] to do the work for her as a work for hire," 742 F.3d at 71, the Court must reconcile this dicta with that court's earlier characterization of express repudiation that clearly indicates such repudiation must be plain.[8]

---

[8] TD Bank's argument that certain emails from 2007 and 2008 indicating that Mr. Hill needed permission from Commerce Bank to publish the 2007 Manuscript or that he needed TD Bank to assign his rights in the 2007

### b. The Written Agreements

Even though the Court decides that the Guaranty did not expressly repudiate Mr. Hill's claim to co-ownership, it does not necessarily follow that Mr. Hill was in fact a co-owner of the 2007 Manuscript when the 2012 Book was published. The Court therefore must address the question of ownership, beginning with an analysis of the written agreements. TD Bank maintains that the Guaranty and the Portfolio Contract put ownership of the copyright exclusively with Commerce Bank, while Mr. Hill argues that the language in both documents is ambiguous at best and therefore he retains his status as co-author and thus an owner of the copyright in the 2007 Manuscript.

When parties dispute the meaning of terms in a contract, the court must determine whether the words are ambiguous. Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992). Where the words are subject to more than one reasonable interpretation, summary judgment is not appropriate. Id. Under New York law,[9] "the parol evidence rule bars the consideration of extrinsic evidence of the meaning of a complete written agreement if the terms of the agreement, considered in isolation, are clear and unambiguous." Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc., 111 F. Supp. 2d 450, 454 (2d Cir. 2000). Extrinsic evidence is "not admissible to create an ambiguity where none exists." Id. at 455 (internal quotations omitted). In addition, "the doctrine of incorporation by reference requires that the paper to be incorporated into the written instrument by reference must be so described in the instrument that the paper may be identified 'beyond all reasonable doubt.'" Ward v.

---

Manuscript after he separated from TD Bank bar his claim likewise has no merit as these emails do not even mention ownership or authorship of the work.

[9] Both the Portfolio Contract and the Guaranty dictate that they are governed by New York law. (See Portfolio Contract ¶ 33; the Guaranty.)

TheLadders.com, Inc., 3 F. Supp. 3d 151, 163 (S.D.N.Y. 2014) (quoting Kenner v. Avis Rent A

Car Sys., Inc., 678 N.Y.S. 2d 213, 214 (1998)).

      The Guaranty incorporated the Portfolio Contract by reference since it clearly stated that

"I refer to the proposed agreement dated September 19, 2006 ("Agreement"), a copy of which is

attached hereto, between Commerce Bank, N.A. . . . and Portfolio . . . for the publication of a

certain work entitled THE POWER OF WOW by Vernon Hill."  See also Mun. Capital

Appreciation Partners, I, L.P. v. Page, 181 F. Supp. 2d 379, 392 (S.D.N.Y. 2002) (finding two

agreements between parties to be integrated where second agreement directly referenced prior

agreement).  Moreover, Mr. Hill himself referred to the Guaranty as part of an integrated

agreement, and Mr. Hill admitted that he "probably" read the agreement when he signed the

Guaranty.  (See Hill Dep. 158:8-11.)

      The meaning of the Guaranty is clear: the 2007 Manuscript is a work made for hire

within the meaning of the Copyright Act,[10] and the "Author," Commerce Bank, is the owner of

the copyright in that work.  The Portfolio Contract explicitly states that Commerce Bank, as the

Author, is the "sole and exclusive owner" of the copyright, differentiating between the "Author"

(Commerce Bank) and Mr. Hill as the literary "author" in the same sentence.  The terms of the

documents cannot "suggest more than one meaning when viewed objectively by a reasonably

---

[10] Under the Copyright Act, a "work made for hire" is either (1) "a work prepared by an employee within the scope of his or her employment," or (2) a work that falls into one of several listed categories "if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."  17 U.S.C. § 101. Since the Guaranty is not signed by both Commerce Bank and Mr. Hill, and the 2007 Manuscript does not fall into one of the statute's enumerated categories, Mr. Hill argues that the Guaranty cannot divest Mr. Hill of his right to ownership as a matter of law.  However, case law is clear that the particular part of the definition of a work made for hire that Mr. Hill relies upon refers to independent contractors, not employees.  See Cmty. for Creative Non-Violence, 490 U.S. at 742-43 ("The structure of § 101 indicates that a work for hire can arise through one of two mutually exclusive means, one for employees and one for independent contractors…"); MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769, 776 (3d Cir. 1991).  Language in a written instrument such as the Guaranty that deems the work to be a work made for hire within the meaning of the Copyright Act may thus vest ownership exclusively with an employer if it is in reference to an employee, such as Mr. Hill, because such agreement merely indicates that the parties agree that the work was within in the scope of employment of the employee and thus a work made for hire under copyright law.

intelligent person who has examined the context of the entire integrated agreement."  Wayland, 111 F. Supp. 2d at 455 (internal quotations omitted).  Since the Guaranty and Portfolio Contract confer ownership on Commerce Bank, and it is undisputed that no writing exists to alter the Guaranty as would be necessary for Plaintiff to transfer its copyright under the Copyright Act, see 17 U.S.C. § 204(a), the Court must deny summary judgment to Defendant and grant summary judgment in favor of Plaintiff on Mr. Hill's co-authorship declaratory judgment claim.

### 2.  Infringement

Having determined that Defendant does not own the copyright in the 2007 Manuscript, the Court must turn to the second element of a copyright infringement claim: whether the defendant copied protected elements of the plaintiff's work.[11]  A plaintiff may prove unlawful copying by showing that the defendant had access to a copyrighted work, and that there are "substantial similarities" between the two works.  Dam Things from Denmark v. Russ Berrie & Co., Inc., 290 F.3d 548, 561 (3d Cir. 2002); see also Ford Motor Co., 930 F.2d at 291 ("[C]opying is demonstrated when someone who has access to a copyrighted work uses material substantially similar to the copyrighted work in a manner which interferes with a right protected by 17 U.S.C. § 106.").  When determining "substantial similarity," a court considers "(1) whether the defendant copied from the plaintiff's work and (2) whether the copying, if proven, went so far as to constitute an improper appropriation." Kay Berry, Inc. v. Taylor Gifts, Inc., 421 F.3d 199, 208 (3d Cir. 2005) (quotations omitted).  Direct evidence of copying or an admission by the infringer satisfies the first part of the test.  Id. (citing Dam Things from Denmark, 290

---

[11] The owner of copyright has the exclusive rights to do or authorize any of the following:
> (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; . . . (5) in the case of literary . . . works, . . . to display the copyrighted work publicly.

17 U.S.C. § 106.

F.3d at 562.)  If copying is found, then "the fact-finder is to determine whether a 'lay-observer' would believe that the copying was of protectible [sic] aspects of the copyrighted work."  Dam Things from Denmark, 290 F.3d at 561 (citing Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc., 797 F.2d 1222, 1232 (3d Cir. 1986)).

  In other words, "[n]ot all copying . . . is copyright infringement."  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); see also Jackson v. Booker, 465 Fed. App'x 163, 166 (3d Cir. 2012) ("Because not all copying is copyright infringement . . . even if actual copying is proven, the court must decide, by comparing the allegedly infringing work with the original work, whether the copying was unlawful.").  "If the similarity concerns only noncopyrightable elements of plaintiff work, or no reasonable trier of fact could find the works substantially similar, summary judgment is appropriate."  Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996) (internal quotations omitted).  In addition, a court must find more than a de minimus copying, in which the copying is of "such a trivial extent as to fall below the quantitative threshold of substantial similarity."  Ringgold v. Black Entm't Television, Inc., 126 F.3d 70, 74 (2d Cir. 1997).

  Here, the parties do not dispute that Mr. Hill copied 16 percent of the 2012 Book from the 2007 Manuscript.  However, Defendant argues that this 16 percent comprised material not protected under the Copyright Act.  This becomes a matter of law for the Court to decide.  Where a work contains both protectable and nonprotectible elements, the proper inquiry is whether the protectable elements, standing alone, are substantially similar.  Crichton, 84 F.3d at 588. Dissimilarities in the works do not dictate a finding of noninfringement, because "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 565 (1985) (quoting Sheldon v. Metro-Goldwyn

24

Pictures Corp., 81 F.2d 49, 56 (2d Cir. 1936)).  The Court will address each of Defendant's

defenses to the copyright infringement claim in turn.

### a.  The Idea-Expression Dichotomy/Merger/Scènes à Faire

Copyright law does not protect ideas, but rather the expression of ideas.  Whelan Assocs.,

797 F.2d at 1234.  "The doctrine is simple to state—copyright will not protect an idea, only its

expression—but difficult to apply."  Tetris Holding, LLC v. Xio Interactive, Inc., 863 F. Supp.

2d 394, 400 (D.N.J. 2012).  A court must determine whether the later work appropriates the

"unique expressions" of the copied work, or merely "contains elements that would be expected

when two works express the same idea or explore the same theme."  Kay Berry, 421 F.3d at 208.

Furthermore, although facts alone are not copyrightable, compilations of facts are.  Feist

Publ'ns, 499 U.S. at 344.  Thus, in factual works such as those at issue here,[12] "[o]thers may

copy the underlying facts from the publication, but not the precise words used to present them."

Id. at 348.  As Defendant points out, factual works are subject to a higher threshold in an

infringement analysis than fictional works; "similarity of expression may have to amount to

verbatim reproduction or very close paraphrasing before a factual work will be deemed

infringed."  Worth v. Selchow & Righter Co., 827 F.2d 569, 572 (9th Cir. 1987) (internal

citations omitted).[13]

Two concepts related to the idea-expression dichotomy serve to deny protection to

otherwise protectable expression.  First, the doctrine of merger dictates that "[w]hen the idea and

the expression of the idea coincide, then the expression will not be protected in order to prevent

---

[12] Both parties refer to the works as factual works.  (See, e.g., Def.'s Br. at 36; Pl's Reply Br. at 26.)

[13] The Worth court found no copyright infringement of factual content despite some verbatim repetition of words because it found that these words were an "indispensable expression" of certain facts and ideas.  Id. at 573.  The Court notes first that this case precedes the Supreme Court's decision in Feist Publ'ns.  Moreover, as becomes clear below, the case is distinguishable because the Worth court found that the repetition was necessary to communicate the facts, whereas the Court makes no such finding here.  Id.

creation of a monopoly on the underlying [work]." Educ. Testing Servs. v. Katzman, 793 F.2d 533, 539 (3d Cir. 1986). Merger may be found where "there are no or few other ways of expressing a particular idea." Id. (quoting Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1253 (3d Cir. 1983)). "Merger is rare, however, and is generally found in works with a utilitarian function." Kay Berry, 421 F.3d at 209. Just because the number of ways an idea may be expressed is limited does not mean that merger applies. See Educ. Testing Servs., 793 F.2d at 539 (finding no merger where defendant used copyrighted ETS questions in its preparation program). "If other methods of expressing that idea are not foreclosed as a practical matter, then there is no merger." Apple Computer, 714 F.2d at 1253.

Second, under the scènes à faire defense, "sequences of events that 'necessarily result from the choice of a setting or situation,' do not enjoy copyright protection." Crichton, 84 F.3d at 587 (quoting Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir 1986)). Scènes à faire "describe those otherwise expressive elements of a work that are 'standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting.'" Southco, Inc. v. Kanebridge Corp., 390 F.3d 276, 287 (3d Cir. 2004) (Becker, J., concurring) (quoting Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc., 307 F.3d 197, 214 (3d Cir. 2002)). The doctrine includes "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 979 (2d Cir. 1980) (quoting Alexander v. Haley, 460 F. Supp. 40, 45 (S.D.N.Y. 1978)).

TD Bank maintains that it is not challenging Mr. Hill's use of any common ideas or themes relating to his business philosophy, "so long as he uses his own creative text . . . to do so." (Pl.'s Br. 22.) It likewise does not allege infringement of certain "buzz words" used in both

works.  Mr. Hill argues that his "life experience, business philosophy, and success at Commerce Bank" are the ideas behind the 2007 Manuscript, and thus the copied words are not protected. (Def.'s Br. 31.)  The parties agree that the alleged infringing material includes these topics. Furthermore, Defendant argues that because there are only a few ways to express the business philosophy underlying Commerce Bank, such ideas are not protected, and that his copying necessarily resulted from the similar setting of the two works.

The Court does not see how the business philosophies at issue here cannot be communicated in various ways.  Although the philosophies may have originated with Mr. Hill, this does not necessarily mean that Mr. Hill is unable to express his ideas in more than one way. Indeed, Mr. Hill admitted that there are a few ways to express the ideas communicated in the works.  Disallowing Mr. Hill from using near identical language to express certain concepts does not bestow on TD Bank a monopoly of those ideas where they can be expressed in a variety of ways.

Mr. Hill did not just copy isolated words and phrases, but rather entire paragraphs, or in some instances, nearly complete pages.  He often replaced "Commerce Bank" with or added to it "Metro Bank," or changed a word here and there.  Still, at a minimum, the alleged copying is a "very close paraphrasing."  <u>Worth</u>, 827 F.2d at 572.  After carefully reviewing the passages at issue, it is obvious to the Court that they constitute more than just a recitation of facts, ideas, or ordinary phrases, even if they are <u>based</u> on facts or ideas or philosophies from Mr. Hill's personal or professional life.

Take this excerpt from the 2007 Manuscript, for example:

There are a lot of banks in the world.  Too many, probably, but it's no different than the explosion of drugstores on every well-trafficked corner, or even the number of books this one competes with for your attention in a bookstore.  It's all about standing out from the

competition, creating visual appeal in the store and sidewalk appeal from the passenger car or bus.

(Pl.'s Ex. H1, 2007 Manuscript at 43.)  Compare it with this excerpt from the 2012 Book:

> There are a lot of banks in the world.  Too many, probably, but it's no different from the explosion of corner shops at every well-trafficked intersection, or even the number of books this one competed with for your attention in a real or virtual bookstore.  It's all about standing out from the competition, creating visual appeal both in the store and for passersby on foot and in cars or buses.

(Pl.'s Ex. H2, 2012 Book at 43-44.)  It cannot seriously be argued that the business idea of standing out among others can only be expressed in this one particular way, by comparing banks to corner shops or drug stores or books.  This is an _expression_ of an idea that is protectable under copyright law because it can be expressed in many ways.

Or, take this example of a factually based paragraph that appears verbatim in both works: "Ray Kroc saw the magic of fast food through the milkshake machine.  He understood that Americans wanted quality, speed, and consistency.  With little competition, McDonald's swept the world, making obsolete existing models that could not change with the times."  (Pl.'s Ex. N1, N2.)  Mr. Hill claims that passages such as this one cannot be expressed in any other way because they state historical facts.  But Mr. Hill can find other words to communicate that Ray Kroc's ideas underlying McDonald's were novel and changed the landscape of the restaurant industry by introducing quality fast food.  Surely hundreds if not thousands of others have compared McDonald's to other successful and innovative business ventures without violating copyright law.  "[C]opyright assures authors the right to their _original expression_, but encourages others to build freely upon the ideas and information conveyed by a work."  _Feist Publ'ns_, 499 U.S. at 349 (emphasis added).  The above-quoted and like passages are original expression, not mere recitations of fact; Mr. Hill is free to build upon the facts, but copyright law does not permit

him to copy in this manner where the idea and the expression do not merge.[14]  Furthermore, this is not a rare utilitarian circumstance in which merger should apply.

Defendant relies on Houlihan v. McCourt, No. 00-3390, 2002 WL 1759822, at *7-9 (N.D. Ill. July 29, 2002), in which the court granted summary judgment in favor of the defendant because it found that the similarity in the second work, a memoir, was "derived from the life stories and experiences of [the authors]," and not from the first work, a play about the authors' lives.  It is true that Mr. Hill's life experiences and business philosophies existed independent of their recounting in the 2007 Manuscript.  But in Houlihan, the issue was whether the memoir was derivative of the play, an issue not expressly addressed here.  And unlike in this case, where passages expressing ideas have been copied almost word-for-word, in Houlihan, the plaintiff could not show that "original material from the play was lifted and used" in the memoir.  Id. at *8.

Certain elements relating to the telling of two similar banks run by the same CEO may well fit within the scènes à faire defense in some circumstances.  However, the defense is not suitable here.  Scènes à faire is properly employed where two works take place in the same historical setting or convey a common theme; not where two works use the same language to recount historical facts.  See, e.g., Winstead v. Jackson, 509 Fed. App'x 139, 142 (3d Cir. 2013) (finding scènes à faire applicable to elements of a standard coming of age story).

For example, in Hoehling, a case upon which Defendant relies, the Second Circuit found the scènes à faire defense applicable where the contested works were about a particular historical

---

[14] Moreover, the parties' disagreement over whether there must be "few" or "many" alternative expressions of an idea to foreclose a merger defense was futile.  The Third Circuit has not formally made this distinction; rather, the application of merger is a case-sensitive inquiry where in some instances, limited means of expressing an idea may implicate the defense, and in other cases it may not.  The Court finds here, however, that the ideas expressed in the works are not as limited as Defendant suggests, and it is for this reason that the merger defense does not apply.

event in Germany, such that the court found that scenes of revelry in a German beer hall and

common German greetings of the period would be impossible to avoid.  Hoehling, 618 F.2d at

979.  The court found these to be examples of "standard literary devices" set among different

relations of the same story.  Id. at 979-80.  However, the court cautioned that

> [b]y factoring out similarities based on non-copyrightable elements, a court runs the risk
> of overlooking wholesale usurpation of a prior author's expression.  A verbatim
> reproduction of another work, of course, even in the realm of nonfiction, is actionable as
> copyright infringement . . . Thus, in granting or reviewing a grant of summary judgment
> for defendants, courts should assure themselves that the works before them are not
> virtually identical.

Id.  This is one of those occasions where the scènes à faire defense does not apply due to

Defendant's significant verbatim copying.[15]  Contrary to Mr. Hill's assertion that if the scènes à

faire defense does not apply here then "no author would be able to write a book about Commerce

Bank's unique philosophy and upstart growth without TD Bank's permission," (Def.'s Br. 36),

the Court finds that others may do so, as long as they do not copy TD Bank's work verbatim.[16]

See Narell v. Freeman, 872 F.2d 907, 912 (9th Cir. 1989) (finding no substantial similarity where

defendant "has not copied the equivalent of a unique line or stanza, but has duplicated a few

ordinary phrases and paraphrased largely factual statements in creating an entirely different kind

of story").

### b.  Fair Use

Defendant also raises the defense of fair use.  Fair use of copyrighted materials "for

purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research,"

---

[15] The copied passages at issue are not simply comprised of commonly used words, phrases and clichés, which are not protectable under copyright law.  Winstead v. Jackson, No. 10-5783, 2011 WL 4407450, at *3 (D.N.J. Sept. 20, 2011) (citing Douglas v. Osteen, 317 Fed. App'x 97, 99 (3d Cir. 2009)).

[16] The other cases Defendant relies upon are similarly distinguishable due to the lack of verbatim copying.  See, e.g., Johnson v. Foxx, 502 F. Supp. 2d 620, 623-24 (E.D. Mich. 2007) (finding scènes à faire defense applicable to the ideas expressed in two songs, but the disputed lyrics were not identical to those of the plaintiff's).

does not amount to infringement.  17 U.S.C. § 107.  To decide whether a particular use was fair, the statute directs a court to consider:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

Id.  Fair use is a mixed question of law and fact, but courts "may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues." Warren Publ'g Co. v. Spurlock, 645 F. Supp. 2d 402, 415-16 (E.D. Pa. 2009) (quoting Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 608 (2d Cir. 2006)).

As a threshold matter, Mr. Hill does not present any evidence that the 2012 book was intended to provide criticism, scholarship, or another permitted purpose under § 107.  However, the statute provides "only general guidance about the sorts of copying" that are most commonly found to be fair use, and thus the defense "calls for case-by-case analysis" of the relevant factors. Campbell, 510 U.S. at 577.

### i.   Purpose and Character of the Use

The 2012 Book was sold publicly and publicized by Mr. Hill, who received royalties. Use of copyrighted materials for commercial purposes weighs against a finding of fair use. Video Pipeline, 275 F. Supp. 2d at 561 (citing Campbell, 510 U.S. at 585).  A court must also consider whether the nature of the allegedly infringing work is transformative, such that the purpose is different than that of the copyright owner's in making the original work.  Id. at 561-62.  Although TD Bank never published or sold the 2007 Manuscript, its purpose was to promote Commerce Bank through the telling of its story and unique business philosophy.  Although Mr. Hill argues that the purpose of the 2012 Book was to "educate the public about the founding and

success of Metro Bank," he presents no evidence to support this assertion.[17]  It is not clear to the

Court, then, that Mr. Hill's copying added much of a different character to the work.  And, "[t]he

fact that a work is unpublished shall not itself bar a finding of fair use."  17 U.S.C. § 107.  Thus,

the first factor cuts in favor of Plaintiff.

### ii.  Nature of the Copyrighted Work

The 2007 Manuscript was a fact-based, informational work.  Generally speaking, "the

more informational or functional the plaintiff's work, the broader should be the scope of the fair

use defense." Leadsinger, Inc. v. BMG Music Publ'g, 512 F.3d 522, 531 (9th Cir. 2008) (quoting

4 Nimmer on Copyright § 13.059[A][2][a]).  Still, courts in this circuit have rejected the fair use

defense in cases of fact-based work.  See, e.g., Educ. Testing Servs., 793 F.2d at 543; FMC

Corp. v. Control Solutions, Inc., 369 F. Supp. 2d 539, 579 (E.D. Pa. 2005) ("[C]ourts do not

hesitate to deny the fair use defense even when the work is nonfiction.") (internal quotations and

citations omitted).  In addition, just because the 2007 Manuscript described facts does not mean

that Mr. Hill could use those same exact words in the 2012 Book, especially where such facts are

not protected under copyright law.  See Love v. Kwitny, 706 F. Supp. 1123, 1134 (S.D.N.Y.

1989) (finding fair use defense inappropriate in a fact-based work where author extensively

quoted the copyrighted work).

Also a "critical element" to this analysis is the unpublished nature of the 2007

Manuscript.  Harper & Row, 471 U.S. at 564.  "[T]he scope of fair use is narrower with respect

to unpublished works . . . [and] the author's right to control the first public appearance of his

expression weighs against such use of the work before its release."  Id.  Defendant submits that

some of the allegedly copied excerpts have already been effectively published because the "same

---

[17] Mr. Hill's failure to earn profits from the 2012 Book does not dictate a finding that it was not created for commercial purposes.

content" was provided in the Harvard Business School study and other speeches; however, Mr. Hill fails to identify specific portions that were copied verbatim, or at all, like they were in the 2012 Book.  See Love, 706 F. Supp. at 1134.  As such, this factor cuts ever so slightly in favor of Plaintiff.

### iii. Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

Sixteen percent of the 2012 Book is copied material from the 2007 Manuscript.  As Defendant points out, the 2007 Manuscript is longer than the 2012 Book, so the percentage of copied text that appears in the copyrighted work is even less.  Thus, from a quantitative perspective, Mr. Hill appears to have used a relatively small portion of the 2007 Manuscript in his book.  However, this factor requires consideration, not just of quantity of material used, but also of its "quality and importance."  Video Pipeline, 275 F. Supp. 2d at 563 (citing Campbell, 510 U.S. at 587).  Though the Court cannot conclude that the copied passages are "the heart" of the 2007 Manuscript, as Plaintiff suggests, they are certainly central to the telling of the Commerce Bank story, as they are filled with unique anecdotes and business practices fundamental to Commerce Bank's success.[18]  See Harper & Row, 471 U.S. at 565.  Likewise, the copied text is crucial to telling the Metro Bank story because it underlies the philosophy that made the bank successful.  Where the reproduced material is significant to the copied work, a court may find in favor of a plaintiff even where the quantity of the copied material is small. See, e.g., Harper & Row, 471 U.S. at 565-66 (finding this factor in favor of the plaintiff where only 13 percent of infringing material was copied, but excerpts played a key role in the

---

[18] The parties actually argue over whether the copied content is "the heart" of the 2012 Book.  But the proper analysis focuses on the quality of the content as it relates to the original work.  See Harper & Row, 471 U.S. at 565 ("As the statutory language indicates, a taking may not be excused merely because it is insubstantial with respect to the infringing work.") (emphasis in original).  Nonetheless, a court may consider the amount of text copied verbatim that makes up the infringing work as evidence of the qualitative nature of the copied materials.  Id. at 566.

infringing work); <u>Video Pipeline</u>, 275 F. Supp. 2d at 564 (finding that this factor weighed against

fair use where two-minute clips from films that were one-to-two hours long were used in

infringing work).  Moreover, "it is no defense to infringement that more of the [work] was not

copied or that the plagiarist's [work] may have some dissimilarities from the original [work]."

<u>Dun & Bradstreet Software Servs.</u>, 307 F.3d at 214.  Thus, at best, this factor favors each party

equally.

### iv. Effect of the Use Upon Potential Market for or Value of Copyrighted Work

"If the intended use is for commercial gain, [the] likelihood [of market harm] may be

presumed."  <u>Video Pipeline</u>, 275 F. Supp. 2d at 565 (quoting <u>A & M Records, Inc. v. Napster,

Inc.</u>, 239 F.3d 1004, 1016 (9th Cir. 2001)).  This is the case here.  Furthermore, it is irrelevant

that TD Bank did not publish the 2007 Manuscript because it has the right to determine whether

or not to exploit its works for financial gain.[19]  <u>See</u> <u>Castle Rock Entm't, Inc. v. Carol Publ'g

Grp., Inc.</u>, 150 F.3d 132, 145-46 (2d Cir. 1998) (finding no fair use even where copied work

actually enhanced market for copyrighted work because "copyright law must respect that

creative and economic choice" of whether to publish a work); <u>see also</u> <u>Salinger v. Random

House, Inc.</u>, 811 F.2d 90, 100 (2d Cir. 1987) ("[Plaintiff] has a right to protect the expressive

content of his unpublished writings for the term of his copyright, and that right prevails over a

claim of fair use.").  Indeed, the statutory language instructs an analysis of the "potential" market

for the copyrighted work.  17 U.S.C. § 107; <u>see also</u> <u>Castle Rock Entm't</u>, 150 F.3d at 145 ("In

considering the fourth factor, our concern is not whether the secondary use suppresses or even

destroys the market for the original work or its potential derivatives, but whether the secondary

---

[19] Mr. Hill's argument that the fact that TD Bank filed the 2007 Manuscript on the docket in this copyright infringement lawsuit precludes a fair use defense has no merit.  Judicial use does not detract from the normal market use of the work.  <u>See</u> <u>supra</u>, Section II(B)(2).

use usurps or substitutes for the market of the original work.")  Plus, should TD Bank ever choose to publish the 2007 Manuscript, it is likely that there would be <u>some</u> impairment caused by the publishing of the 2012 Book, even if it would not displace the entire market.  The fourth fair use factor weighs in Plaintiff's favor.

The Court finds that, on balance, Mr. Hill's claim of fair use fails, as at least three of the four factors favor Plaintiff.

### c.   Copyright Misuse

Defendant urges the Court to grant summary judgment in his favor because of Plaintiff's purported copyright misuse.  Mr. Hill claims that TD Bank is doing nothing more than trying to "suppress the speech of its former CEO."  (Def.'s Br. 44.)  Specifically, TD Bank never published the 2007 Manuscript, so Mr. Hill argues that his subsequent work does not harm his opponent.[20]

Copyright misuse may be found where a copyright holder asserts its rights in a way that is "contrary to the public interest," namely "to stimulate artistic creativity for the general public good."  <u>Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.</u>, 342 F.3d 191, 204 (3d Cir. 2003) (internal quotations omitted).  "Misuse often exists where the patent or copyright holder has engaged in some form of anti-competitive behavior."  <u>Id.</u>  For instance, the Third Circuit has opined that copyright misuse might occur where an individual obtains the copyright to something written about himself for the sole purpose of preventing others from publishing biographical material concerning him.  <u>Id.</u> at 205 (citing <u>Rosemont Enters., Inc. v. Random House, Inc.</u>, 366 F.2d 303, 311 (2d Cir. 1966)).

---

[20] Defendant has not provided the Court with any support for the suggestion that a court must examine whether the plaintiff has suffered any harm from the publication of an infringing work in order to escape this defense.

Defendant relies on Omega S.A. v. Costco Wholesale Corp., where the court admonished that "private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." 776 F.3d 692, 705 (9th Cir. 2015) (quoting Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156 (1975)).  There, in order to prevent unauthorized retailers from selling its watches obtained on the "grey market," the plaintiff began engraving a newly copyrighted design inconspicuously on the watches, thus effectively copyrighting the watch itself.  Id. at 702-03.  The court found copyright misuse because Omega admitted to securing the copyright in the design solely in order to use copyright law to restrict the sale of the watches, thus expanding the scope of its otherwise lawful monopoly.  Id. at 703 ("Omega misused its copyright when it used its intellectual property protection to obtain a copyright-like monopoly over uncopyrightable . . . watches.").

TD Bank did not engage in copyright misuse here.  While it requires no leap in logic to assume that preventing Mr. Hill from publishing the 2012 Book, which describes the success of his newest bank, might have an effect on Metro Bank's competition with TD Bank, Mr. Hill has produced no such evidence; nor is there any evidence presented to the Court that Plaintiff's purpose in copyrighting its work and bringing this infringement action was to exert otherwise impermissible control over the banking marketplace.  As TD Bank maintains, Mr. Hill is free to publish materials relating to his business philosophies, business ventures, or life experiences, so long as they do not infringe on TD Bank's copyrighted material.  Indeed, TD Bank does not contest the 84 percent of the 2012 Book that discusses such topics, including Metro Bank, without the unlawful copying.  Plaintiff's copyright claim is not "likely to interfere with creative expression to such a degree that [it] affect[s] in any significant way the policy interest in

increasing the public store of creative activity." Video Pipeline, 342 F.3d at 206.[21]  The

copyright misuse defense fails where a plaintiff merely seeks to enforce its copyright, and

nothing more.  See Arista Records, Inc. v. Flea World, Inc., 356 F. Supp. 2d 411, 428-29 (D.N.J.

2005).

### d.  Conclusion as to Copyright Infringement Claim

Mr. Hill does not own the copyright in the 2007 Manuscript.  Moreover, none of Mr.

Hill's defenses to his infringement of the 2007 Manuscript have merit.  As a lay observer, had

the Court read the two works, it would have immediately found a connection between them.  The

protectable elements of Plaintiff's work are substantially similar to Defendant's subsequent

work.  This is true regardless of how much of the 2012 Book Mr. Hill declined to copy.  As there

are no genuine issues of fact in dispute, this Court finds in favor of Plaintiff as a matter of law

and thus grants summary judgment as to the Copyright Infringement claim.  In addition, though

neither party addressed Defendant's declaratory judgment counterclaim of non-infringement, it

necessarily follows that the Court must enter judgment against Defendant on this counterclaim.

(See Doc. No. 18, ¶¶ 59-63.)

### D.  Mr. Hill's Counterclaim Under 17 U.S.C. § 512(f)

Section 512 of the Copyright Act, known as the Digital Millennium Copyright Act

("DMCA") provides an avenue by which a copyright owner can police suspected infringement

by allowing the party to serve a "takedown notice" to an online service provider if the owner

possesses a "good faith belief that use of the material in the manner complained of is not

authorized by the copyright owner."  17 U.S.C. § 512(c)(3)(A)(v).  Receiving such a notice

---

[21] Moreover, Video Pipeline and the cases upon which it relies mainly concern clauses in licensing agreements that served anti-competitive purposes.  See, e.g., Lasercomb Am., Inc. v. Reynolds, 911 F.2d 970, 979 (4th Cir. 1990) (finding misuse in licensing agreement that attempted to control competition of unprotected expression of ideas).

essentially requires the provider to remove the allegedly infringing material from the internet. See § 512(c)(3).  The DMCA enforces this provision by providing that, "Any person who knowingly materially misrepresents under this section . . . that material or activity is infringing . . . shall be liable for damages, including costs and attorneys' fees, incurred by the alleged infringer . . . ." § 512(f).

TD Bank moves for summary judgment on this counterclaim.  The parties argue over whether TD Bank held a "good faith" belief that the 2012 Book infringed on its copyright at the time it issued the takedown notices.  TD Bank maintains that it was its subjective belief that is relevant to the analysis, which requires a knowing misrepresentation by the copyright owner, whereas Mr. Hill claims that the proper inquiry is whether a copyright owner should have known that it was making a material misrepresentation.  Moreover, Mr. Hill argues that, whatever the standard, there is a material issue of fact as to whether TD Bank subjectively knew it was making misrepresentations, and so summary judgment on this claim is not appropriate.[22]

The "good faith belief" requirement of § 512(c)(3)(A)(v) is a subjective standard.  Rossi v. Motion Picture Ass'n of Am., Inc., 391 F.3d 1000, 1004 (9th Cir. 2004).  Thus liability will only be imposed under § 512(f) where there is a "demonstration of some actual knowledge of misrepresentation on the part of the copyright owner."  Id. at 1005 (emphasis added); see also Cabell v. Zimmerman, No. 09-10134, 2010 WL 996007, at *5 (S.D.N.Y. March 12, 2010) (finding negligence insufficient to impose liability under § 512(f)).

---

[22] Contrary to Defendant's reading of this Court's prior Opinion on Plaintiff's Motion to Dismiss (Doc. No. 40), Mr. Hill needs to do more than show that TD Bank knew that Mr. Hill was a co-author of the 2007 Manuscript.  That Opinion addressed the § 512(f) claim in the context of a motion to dismiss, where the Court is obligated only to determine whether the claimant has alleged enough facts to state a claim upon which relief may be granted.  The Court opined only that one way to survive the motion was to allege, as Mr. Hill did, that he was a co-author of the work at issue, since whether his co-authorship conferred ownership status at the time the 2012 Book was published had not yet been determined.

Despite Mr. Hill's contention, there is no issue of material fact here as to TD Bank's good faith belief that it could properly issue takedown notices.  It is undisputed that TD Bank consulted its copyright counsel, who reviewed the two works, before filing the notices.  Mr. Hill insists that a material dispute of fact exists because TD Bank's representative stated in his deposition that he did not know specifically what steps the bank undertook to determine whether Mr. Hill was a co-owner of the copyright.  (Fisher Dep. 308:1-15.)  But TD Bank produces evidence that its counsel reviewed the Guaranty and the Portfolio Contract as to the ownership issue.  (Certification of Lori E. Lesser, ¶¶ 5-8.)  Moreover, TD Bank's representative also stated that there was "full review by copyright counsel" when asked what steps TD Bank took to ensure that it owned the copyright.  (Fisher Dep. 310:1-310:15.)  By merely pointing to testimony showing that one TD Bank representative may not have had knowledge as to the exact steps undertaken during the consultation with its experienced outside counsel, Defendant has done no more than merely show "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., 475 U.S. at 586.  Mr. Hill has presented no evidence that TD Bank had actual knowledge of any material misrepresentation, and thus the Court finds in TD Bank's favor.[23]

### E.  Relief

Having found that summary judgment in favor of TD Bank is appropriate, the Court addresses Plaintiff's entitlement to relief.  TD Bank seeks an injunction pursuant to § 502 of the Copyright Act, as well as profits from the sale of the 2012 Book pursuant to § 504(b).[24]  (Compl. ¶¶ 22, 24.)  Mr. Hill asks the Court to grant summary judgment in his favor on this issue because

---

[23] The Court also notes that, for the reasons expressed in this Opinion, supra, TD Bank is the lawful and exclusive owner of the copyright in the 2007 Manuscript, upon which Mr. Hill has infringed.  It is hard to argue that a finding of summary judgment for Plaintiff is not appropriate under Mr. Hill's § 512(f) counterclaim in this situation, where the plaintiff prevails on the underlying copyright claim.

[24] TD Bank has withdrawn its claims for damages based on actual harm, statutory damages, and attorneys' fees, as well as its impoundment claim under 17 U.S.C. § 503.

TD Bank is not entitled to any of its requested relief.  The Court addresses TD Bank's requests in turn.

### 1. Injunctive Relief

Even upon a finding of infringement, a plaintiff seeking a permanent injunction must establish the following: (1) that it has suffered an irreparable injury; (2) that there is no adequate legal remedy, such as monetary damages; (3) that the balance of hardships between the plaintiff and defendant warrants an injunction; and (4) that the public interest favors such relief.  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391-93 (2006) ("[T]his Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed.").  There is no presumption of irreparable harm where copyright infringement is found.  See Broadcast Music, Inc. v. Publick House Partners, LLC, No. 13-3326, 2015 WL 3396804, at *4 (D.N.J. 2015) (discussing eBay and its progeny).

TD Bank claims that the irreparable harm it suffers is the violation of its exclusive rights as the owner of the copyright and the substantial likelihood of future infringement by Mr. Hill. Courts have held that irreparable harm may be based on past and future infringement both pre- and post- eBay.  See, e.g., Brighton Collectibles, Inc. v. Pedre Watch Co., No. 11-00637, 2013 WL 5719071, at *4 (S.D. Cal. Oct. 21, 2013); Broadcast Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd., 555 F. Supp. 2d 537, 543 (E.D. Pa. 2008); Designer Skin, LLC v. S & L Vitamins, Inc., No. 05-3699, 2008 WL 4174882, at *4-5 (D. Ariz. Sept. 5, 2008); Superhype Publ'g, Inc. v. Vasiliou, 838 F. Supp. 1220, 1226 (S.D. Ohio 1993).  However, a plaintiff must demonstrate a threat of future infringement "beyond mere conclusory assertions."  Brighton Collectibles, 2013 WL 5719071, at *4.  TD Bank simply has not pointed the Court toward any

evidence that Mr. Hill will continue to infringe on TD Bank's material.  TD Bank also fails to address entirely the adequacy of a monetary award of damages, and the balance of hardships between Plaintiff and Defendant.  As TD Bank bears the burden of establishing all four elements and it has failed to do so, the Court finds that TD Bank is not entitled to permanent injunctive relief.

### 2. Profits

Section 504(b) of the Copyright Act states that the copyright owner "is entitled to recover . . . any profits of the infringer that are attributable to the infringement."  17 U.S.C. § 504(b). Furthermore, the statute provides that, "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."  Id.

The courts have differentiated between two types of profits: direct profits (generated by selling an infringing product) and indirect profits (revenue earned from operations enhanced by the infringement).  See William A. Graham Co. v. Haughey, 568 F.3d 425, 442 (3d Cir. 2009). Whether direct or indirect, the plaintiff must show a nexus between the profits and the infringement before the burden shifts to the defendant to apportion the profits that were not the result of infringement.  Andreas v. Volkswagen of Am., Inc., 336 F.3d 789, 796 (8th Cir. 2003); see also William A. Graham Co., 568 F.3d at 442.

This is a case of direct infringement, as any profits earned were generated directly from selling the 2012 Book.  TD Bank must therefore produce evidence of Mr. Hill's gross revenue from the sale of the book.  Assuming it can meet its burden, it is then up to Mr. Hill to argue "elements of profit attributable to factors other than the copyrighted work."  The 2012 Book was

41

still for sale at the time that this motion was filed, making a determination as to the amount of gross revenue earned premature.  Thus, the Court denies Defendant's Motion for Summary Judgment as to Plaintiff's claim for profits under § 504(b).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is **GRANTED**. Defendant's Cross-Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  Both Plaintiff's and Defendant's Motions to Seal are **DENIED**.  All that remains in this litigation is Plaintiff's claim for profits pursuant to 17 U.S.C. § 504(b), which the Court will address at a hearing to be scheduled.  An appropriate Order shall issue.


Dated:  7/27/2015                                         s/ Robert B. Kugler
                                                                   ROBERT B. KUGLER
                                                                   United States District Judge